UNITED STATES v. HARMON.

*(District Court, D. Kansas.  March, 1891.)*

1. OBSCENE MATTER IN THE MAILS—CONSTITUTIONAL LAW.
    Rev. St. U. S. § 3893, (25 St. 496,) prohibiting the use of the mails for obscene matter, is not unconstitutional as being in contravention of the provision of the first amendment of the constitution that "congress shall make no law * * * abridging the freedom of speech or of the press."

2. SAME—WHAT CONSTITUTES OBSCENE MATTER.
    Matter is "obscene" within the meaning of the statute (Rev. St. U. S. § 3893) when it is offensive to the common sense of decency and modesty of the community, and is of such a character as to deprave and corrupt those whose minds are open to such immoral influences.  Whether the particular matter in question comes within that definition is a question for the jury.

3. SAME—INTENT.
    Where the obscene matter in question was contained in a newspaper intended for miscellaneous circulation, and related to the prevalence of sexual abuses, and was expressed in blunt, coarse terms, too indecent for repetition, it is no defense that defendant was actuated by no criminal intent, but solely by a desire to improve the sexual habits, correct abuses, and thereby benefit the human race.

4. CRIMINAL LAW—OBJECTIONS TO INDICTMENT.
    An objection to the sufficiency of the indictment must be taken before trial by motion to quash or demurrer, or, after trial, by motion in arrest.  It cannot be raised at the trial by objecting to the introduction of evidence in support of it.

At Law.

This is an indictment for depositing an obscene publication in the United States post-office in violation of the provisions of section 3893, Rev. St. U. S., (25 St. p. 496.)   The prosecution grew out of the following state of facts:   The defendant is the editor and publisher of a newspaper at Valley Falls, Kan., entitled "Lucifer, the Light Bearer." It is a paper of singularity.   The issue in question is dated "February 14, E. M. 291."   It begins its date from 1st of January, 1501, which he calls the beginning of the era of man.   Its platform or motto is: "Perfect freedom of thought and action for every individual within the limits of his own personality.   Self-government the only true government.   Liberty and responsibility the only basis of morality."   The paper contains some general news and advertisements, but its specialty is the discussion of sexual relation, and a portrayal of its excesses and abuses.   As side-boards to this matter, it teems with homilies and essays on the liberty of individual conscience, and the liberty of speech and of the public press.   On the date above given, which is, according to the common calendar, the 14th of February, 1890, this paper contained an article of over a column, headed, "A Physician's Testimony," purporting to be written by one "Richard V. O'Neill, M. D.," of 330 East Seventieth street, New York.   This communication sets out with much particularity various instances falling within his professional experience and practice of abuses of women by their husbands in coercive cohabitation; of family habits of men, boys, and girls, gratifying an unnamable propensity of the father, and the unnatural intercourse between a man and beasts.   These acts are described in blunt, coarse terms, too indecent and filthy to be here given *in hæc verba*.   The pleader, however, has set the whole article out in exact words in the indictment.   At the trial the government

and defendant waived a jury, and submitted the case to the court to try both the questions of fact and law. It was admitted that the defendant placed the newspaper containing this publication in the United States post-office for transmission to the party to whom it was directed, knowing that it contained this communication. It was also admitted that the defendant has about 1,500 regular subscribers to this paper, embracing heads of families, scattered through the state and elsewhere in the United States. The defendant was permitted to testify as to his motive in publishing such articles, for the purpose of showing, as claimed by his counsel, that he was actuated solely by a purpose to improve the sexual habits, to correct its abuses, and thereby better the human race; and that in all other relations of life he bore a good character as a peaceable, well-conducted citizen. He is a married man, living in wedlock with his second wife, having been divorced from the first. He is now about 60 years of age.

*J. W. Ady*, U. S. Dist. Atty., and *P. L. Soper*, Asst. U. S. Dist. Atty. *David Overmeyer*, for defendant.

PHILIPS, J. *Objection to the Indictment.* Both at the hearing and on the argument of the law and the facts objection was made to the sufficiency of the indictment. The court might, perhaps, with propriety pass upon this objection here, but it is always best that a case should be determined according to well-settled rules of procedure. At common law, objection to the sufficiency of the indictment must be taken prior to trial by motion to quash or demurrer. If not then interposed, it must come after trial by motion in arrest. 1 Whart. Crim. Law, (7th Ed.) §§ 519, 524, 525. While under the Code of this state the sufficiency of the petition or pleading in civil cases may be raised on the trial by objecting to the introduction of any evidence in support of it, it has been expressly held by the supreme court of Missouri, under a similar Code, that this rule of practice has no application to criminal proceedings. *State* v. *Risley*, 72 Mo. 609.

*The Constitutionality of the Act of Congress.* It is next objected that the act of congress under which this indictment was founded is in contravention of the first amendment of the federal constitution, which declares that "congress shall make no law   *   *   *   abridging the freedom of speech or of the press." Counsel has urged this objection with such force and vigor of reasoning as to entitle it to serious consideration under other conditions than those which exist. The constitutionality of the act in question has been affirmed by the court of last resort in the case of *Ex parte Jackson*, 96 U. S. 727. It is true, the direct question there presented was as to that branch of the statute denying the use of the mails to lottery circulars, etc.; but the opinion of the court proceeds on the theory that the provision of the statute respecting lotteries is so closely allied to that declaring obscene literature non-mailable matter that it must rest upon the same principle, and thereupon proceeds to discuss the latter feature of the statute, and to uphold its constitutionality. Until overruled, this decision must control the action of this court. In view, how-

ever, of the fact that the defendant places so much stress along the line of his entire defense on the liberty which should be accorded to the press, it may as well be said here as elsewhere that it is a radical misconception of the scope of the constitutional protection to indulge the belief that a person may print and publish, *ad libitum*, any matter, whatever the substance or language, without accountability to law.   Liberty in all its forms and assertions in this country is regulated by law.   It is not an unbridled license.   Where vituperation or licentiousness begins, the liberty of the press ends. , While the genius of our institutions of government accords the largest liberality in the utterance of private opinion, and the widest latitude in polemics, touching questions of social ethics, political and domestic economy, and the like, it must ever be kept in mind that this invaluable privilege is not paramount to the golden rule of every civilized society, *sic utere tuo ut non alienum lædas*,— "so exercise your own freedom as not to infringe the rights of others or the public peace and safety."   2 Story Const. § 1888.   While happily we have outlived the epoch of censors and licensors of the press, to whom the publisher must submit his matter in advance, responsibility yet attaches to him when he transcends the boundary line where he outrages the common sense of decency, or endangers the public safety.   As said by that eminent jurist, Judge Story, (Id. §§ 1884–1887:)

"There is a good deal of loose reasoning on the subject of the liberty of the press, as if its inviolability were constitutionally such that, like the king of England, it could do no wrong, and was free from every inquiry, and afforded a perfect sanctuary for every abuse; that, in short, it implied a despotic sovereignty to do every sort of wrong without the slightest accountability to private or public justice. Such a notion is too extravagant to be held by any sound constitutional lawyer, with regard to the rights and duties belonging to governments generally or to the state governments in particular. If it were admitted to be correct, it might be justly affirmed that the liberty of the press was incompatible with the permanent existence of any free government. * * * In short, is it contended that the liberty of the press is so much more valuable than all other rights in society that the public safety, nay, the existence of the government itself, is to yield to it? It would be difficult to answer these questions in favor of the liberty of the press without at the same time declaring that such a license belonged and could belong only to a despotism, and was utterly incompatible with the principles of a free government."

In a government of law the law-making power must be recognized as the proper authority to define the boundary line between license and licentiousness, and it must likewise remain the province of the jury— the constitutional triers of the fact—to determine when that boundary line has been crossed.

*The Test of Obscenity, etc.*  The language of the statute (section 3893, p. 496, 25 St. at Large) is as follows:

"Every obscene, lewd, or lascivious book, pamphlet, picture, paper, letter, writing, print, or other publication of an indecent character, * * * are hereby declared to be non-mailable matter, and shall not be conveyed in the mails, nor delivered from any post-office, nor by any letter carrier; and any person who shall knowingly deposit, or cause to be deposited, for mailing or

delivery, anything declared by this section to be non-mailable matter, and any person who shall knowingly take the same, or cause the same to be taken, from the mails for the purpose of circulating or disposing or aiding in the circulation or disposition of the same, shall," etc.

The statute does not undertake to define the meaning of the terms "obscene," etc., further than may be implied by the succeeding phrase, "or other publication of an indecent character." On the well-recognized canon of construction these words are presumed to have been employed by the law-maker in their ordinary acceptation and use. As they cannot be said to have acquired any technical significance as applied to some particular matter, calling, or profession, but are terms of popular use, the court might perhaps with propriety leave their import to the presumed intelligence of the jury. A standard dictionary says that "obscene" mean "offensive to chastity and decency; expressing or presenting to the mind or view something which delicacy, purity, and decency forbid to be exposed." This mere dictionary definition may be extended or amplified by the courts in actual practice, preserving, however, its essential thought, and having always due regard to the popular and proper sense in which the legislature employed the term. Chief Justice COCKBURN, in *Rex* v. *Hicklin*, L. R. 3 Q. B. 360, said: "The test of obscenity is this: Where the tendency of the matter charged as obscene is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall;" and where "it would suggest to the minds of the young of either sex, or even to persons of more advanced years, thoughts of the most impure and libidinous character." So, also, it has been held that a book is obscene "which is offensive to decency or chastity, which is immodest, which is indelicate, impure, causing lewd thoughts of an immoral tendency." *U. S.* v. *Bennett*, 16 Blatchf. 338. Judge THAYER, in *U. S.* v. *Clarke*, 38 Fed. Rep. 732, observed:

"The word 'obscene' ordinarily means something which is offensive to chastity; something that is foul or filthy, and for that reason is offensive to pure-minded persons. That is the meaning of the word in the concrete; but when used, as in the statute, to describe the character of a book, pamphlet, or paper, it means containing immodest and indecent matter, the reading whereof would have a tendency to deprave and corrupt the minds of those into whose hands the publication might fall whose minds are open to such immoral influences."

Laws of this character are made for society in the aggregate, and not in particular. So, while there may be individuals and societies of men and women of peculiar notions or idiosyncrasies, whose moral sense would neither be depraved nor offended by the publication now under consideration, yet the exceptional sensibility, or want of sensibility, of such cannot be allowed as a standard by which its obscenity or indecency is to be tested. Rather is the test, what is the judgment of the aggregate sense of the community reached by it? What is its probable, reasonable effect on the sense of decency, purity, and chastity of society, extending to the family, made up of men and women, young boys and girls,—the family, which is the common nursery of mankind, the foun-

dation rock upon which the state reposes?    The question was asked with
eloquent energy by the learned counsel, commenting on the term
"deemed" to be obscene, as employed by Mr. Justice FIELD in *Ex parte
Jackson, supra*: Who is to deem, who is to judge, whether a given publi-
cation impinges upon the general sense of decency?    Shall every post-
master have the power to deem the matter injurious to the public morals?
Shall one postmaster deem a thing injurious and another harmless, and
shall the freedom of the press be at the mercy of an indifferent lot of
postmasters exercising no responsible discretion?    The answer to this is,
that asserted violations of this statute, like other criminal statutes, must
be left to the final arbiter under our system of government,—the courts.
The jury, the legally constituted triers of the fact under the constitution,
is to pass upon the question of fact.    Under our institutions of govern-
ment the panel of 12 are assumed to be the best and truest exponents
of the public judgment of the common sense.    Their selection and con-
stitution proceed upon the theory that they mostly nearly represent the
average intelligence, the common experience and sense, of the vicinage;
and these qualifications they are presumed to carry with them into the
jury-box, and apply this average judgment to the law and the facts.
Sitting as the court does in this case, in the stead of the jury, it may not
apply to the facts its own method of analysis or process of reasoning as a
judge, but should try to reflect in its findings the common experience,
observation, and judgment of the jury of average intelligence.    How
would the language—the subject-matter—in this article from the pen of
"Richard V. O'Neill, M. D." impress and affect the average man and
woman of intelligence and sensibility?    What is its probable effect upon
society in general?    How would such language and matter impress a
public assembly of decent men and women?    How would it be received
in and affect the average family circle of 1,500 subscribers to whom the
evidence shows this garbage was sent?    The subjects discussed and the
language employed are too coarse and indecent for the man of aver-
age education and refinement to recapitulate.    They are so filthy in
thought and impure in terms as not to admit of recitation without a
shock to the common sense of decency and modesty; and it does seem
to me that it is not too much to say that no ordinary mind can subject
itself to the repeated reading and contemplation of such subjects and
language without the risk of becoming indurated to all sense of modesty
in speech and chastity in thought.    The appetite for such literature in-
creases with the feeding.    The more it is pandered to, the more insati-
able its craving for something yet more vicious in taste.    And while it
may be conceded to the contention of counsel that the federal govern-
ment, under its constitutional limitations, ought not to take upon itself
the office of *censor morum*, nor undertake to legislate in regulation of the
private morals of the people, yet congress may, as the basis of legislation
of this character, have regard to the common *consensus* of the people that
a thing is *malum in se*,—is hurtful to the public morals,—endangering the
public welfare, and therefore deny to it as a vehicle of dissemination the
use of its post-offices and post-roads, devised and maintained by the

government at the public expense for the purpose of promoting the public welfare and common good.

*The Criminal Intent.* We are next confronted with the principal contention of the defendant, that the act—the thing done by him—is wanting in the criminal intent which, as he contends, qualifies every criminal offense, especially one rising to the degree of a felony. The argument is that if the offense in question is completed by the mere overt act of knowingly placing in the post-office an obscene print, publication, etc., it would subject to indictment and punishment the judge of this circuit for sending the indictment herein containing the forbidden publication, sent him through the mail by mistake, back to the clerk of the court through the mails, or that such a publication made in a law book as a report of this case would subject the publisher to the penalty of the law for mailing it to his subscribers; that as the overt act of the judge, for instance, can only be exonerated in law by proof of the absence of criminal intent, the rule of exception must be indifferently applied; so that in every case the question of intent, motive, purpose, must be open to inquiry; and if there was no evil design, no *animus mali*, the jury should be directed to acquit. The deduction from this particularization has for its postulate a radical misconception of the postal organization, and the scope and policy of the law touching obscene literature. The government is authorized, not commanded, by the constitution to maintain post-offices and post-roads. The system is organized and maintained by the government on the public responsibility, solely for the purpose of promoting the public welfare, in facilitating business, commercial, and social intercourse. It is designed to aid legitimate business, and not such as is calculated directly to corrupt the public morals, and sap the foundations of society and government. Having the right to establish or disestablish post-offices and post-roads, just as the public interests may require, congress may say to what extent the public or any individual may use them, and for what purpose, and may therefore limit both the quantity and the quality of the matter sent through the mails. The public officer, like a judge, who commits to the mails an indictment containing the vicious publication in question in the performance of an official duty connected therewith, and in the administration of public justice, is employing the mails within the purview of the object of the constitution. Such a user must, *ex necessitate rei*, be held by the courts to be the exception to the letter of the statute arising from necessary implication, as much so as in the case of the Bolognian law, which enacted "that whoever drew blood in the streets should be punished with the utmost severity." It was held not to apply to the surgeon who opened a vein of a person in order to save his life when he had fallen in the street in a fit. And again, it is obvious from the whole context of the act of congress in question, as well as the popular history attending its enactment, that it was leveled at the circulation and disposition of the forbidden matter as such in its relation to society. It is to prevent the supposed hurtful effect of the receiving and reading of such indecent literature published as such by declaring it non-mailable,

and the statute should be so construed by the courts as to effectuate the legislative intent. "When the true intention is accurately ascertained, it will always prevail over the literal sense of the terms. The occasion and necessity of the law, the mischief felt, and the object and remedy in view, are to be considered. A thing within the intent of the legislature in framing the statute is sometimes as much within the statute as if it were within the letter." *In re Bomino*, 83 Mo. 441. It is too much to claim that statutes of a highly penal character must universally require proof of the existence of a criminal intent in the violator, in the broad sense of that term. There is a recognized class of offenses where the thing done is hurtful, and the probable consequences may be injurious, where "the intention is inferred from doing the act." As said by BLACKBURN, J., in *Rex* v. *Hicklin*, *supra:* "If the party does an act which is illegal, it does not make it legal that he did it with some other object." This doctrine was applied in *Reg.* v. *Dickson*, 3 Maule & S. 11, to the instance where a man gave to children unwholesome bread, but without any intent to harm them; and in *Reg.* v. *Vantandillo*, 4 Maule & S. 73, where a person carried a child suffering from a contagious disease along a public highway, endangering the health of all passing along, it was held to be a misdemeanor without any allegation or proof that the defendant intended that anybody should catch the disease. In *Com.* v. *Mash*, 7 Metc. (Mass.) 472, the party was indicted and convicted for bigamy, where the defendant sought to show that her husband had absented himself for a great length of time, and she had remarried under the honest belief that he was dead. Chief Justice SHAW, *inter alia*, said:

"It was urged in the argument that where there is no criminal intent there can be no guilt, and if the former husband was honestly thought to be dead there could be no criminal intent. The proposition stated is undoubtedly correct in a general sense, but the conclusion drawn from it in this case by no means follows. Whatever one voluntarily does he, of course, intends to do. If the statute has made it criminal to do any act under particular circumstances, the party voluntarily doing that act is chargeable with the criminal intent of doing it."

This statute was predicated of the vast importance to society of preventing polygamy. In *Com.* v. *Emmons*, 98 Mass. 6, the defendant was indicted and convicted for admitting a minor to his billiard room without the written consent of his parents. He sought to acquit himself of the act by showing that the defendant was almost of age, was fully grown, doing business for himself, and that he honestly believed that he was of age. The court says that this evidence is immaterial. "The prohibition of the statute is absolute. The defendant admitted him to his room at his peril, and is liable to the penalty whether he knew him to be a minor or not. The offense is of that class where knowledge or guilty intent is not an essential ingredient in its commission, and need not be proved." And on the same principle it is held by the supreme court of Missouri, in *Beckham* v. *Nacke*, 56 Mo. 546, that a magistrate performing the marriage ceremony of a minor without the consent of his parents was liable to the penalty of the statute, although he acted un-

der a *bona fide* belief that the minor was of full age; the law, as declared by the court, being to prevent the reckless marriage of minors without the consent of their parents. In *Montross* v. *State*, 72 Ga. 261, the defendant was indicted and convicted for distributing indecent pictorial newspapers. He undertook on the trial to negative the existence of any criminal intent, by showing that he had simply taken the picture to a police officer for the purpose of testing the validity of the law. The court said:

"Every person is presumed to have intended the natural legal consequences of his conduct, whether that conduct be *malum in se*, as we think this was, or *malum prohibitum*. There is no pretense that this defendant was unapprised of the law under which he is prosecuted."

It is not a sufficient answer to this class of cases to say, as was suggested on the hearing, that in the case of the law respecting minors, and the like, a party dealing with them, as a universal principle of law, must take notice of the disabilities which attach to their minority. These laws, as in the case of polygamy, are based upon public policy, and the law is arbitrary, and holds the party responsible for the consequences of his act when the means of knowledge are in his reach. It is a part of the common law of the land that indecent exposures, the uttering of obscene words in public, and the like, are indictable offenses. It rests upon the universal *consensus* that such things are impure, indecent, and hurtful to the public morals and the common welfare: and, as every man is supposed to know this fact, when he knowingly violates the statute, and gives publicity to such matter, he stands without an excuse in law. The enforcement of the federal revenue laws not inaptly illustrates the proposition that offenses endangering the public welfare are made felonies, infamous crimes under the constitution, where the criminal intent does not qualify the act. A retail dealer in spirituous liquors is required to take out a license, not as a prohibitory measure looking to any matter of public morals, but as a means of collecting the revenue essential to the support of the government. The sale of one pint exposes the offender to indictment, fine, and imprisonment at hard labor, if he had not the license, although he may sell it to raise money to buy necessary medicine where human life is in issue, or when he may sell it to a sick man whose restoration demands its ministration. His object in making the sale in no wise acquits him of the offense, however much it may mitigate his punishment by the court. The validity of the law regulating the sale of oleomargarine is upheld by the courts, and although there are people who believe it is wholesome, and the vendor should believe that the public health would be promoted by its use, yet if he knowingly sells it without the requisite license and stamp, notwithstanding the purchaser knows what he is getting, he commits an indictable offense, and incurs the penalty. It is deemed by congress as a subject of regulation for the public good; and as a means to that end congress, as a preventive, has imposed most severe penalties, just as it has in the instance of obscene literature.

Reduced to its actual essence, the ultimate position of defendant is

this: That although the language employed in the given article may be obscene, as heretofore defined, yet as it was a necessary vehicle to convey to the popular mind the aggravation of the abuses in sexual commerce inveighed against, and the object of the publisher being to correct the evil and thereby alleviate human condition, the author should be deemed a public benefactor, rather than a malefactor. In short, the proposition is that a man can do no public wrong who believes that what he does is for the ultimate public good. The underlying vice of all this character of argument is that it leaves out of view the existence of the social compact, and the idea of government by law. If the end sought justifies the means, and there were no arbiter but the individual conscience of the actor to determine the fact whether the means are justifiable, homicide, infanticide, pillage, and incontinence might run riot; and it is not extravagant to predict that the success of such philosophy would remit us to that barbaric condition where

> "No common weal the human tribe allied,
> Bound by no law, by no fixed morals tied,
> Each snatched the booty which his fortune brought,
> And wise in instinct each his welfare sought."

Guiteau stoutly maintained to the end his sanity, and that he felt he had a patriotic mission to fulfill in taking off President Garfield, to the salvation of a political party. The Hindu mother cast her babe to the advouring Ganges to appease the gods. But civilized society says both are murderers. The Mormon contends that his religion teaches polygmey; and there is a school of so-called "modern thinkers" who would abolish monogamy, and erect on the ruins the flagrant doctrine of promiscuity, under the disguise of the affinities. All these claim liberty of conscience and thought as the basis of their dogmas, and the *pro bono publico* as the strength of their claim to indulgence. The law against adultery itself would lie dormant if the libertine could get the courts to declare and the jury in obedience thereto to say that if he invaded the sanctuary of conjugal life under the belief that the improvement of the human race demanded it he was not amenable to the statute. Society is organized on the theory, born of the necessities of human well-being, that each member yields up something of his natural privileges, predilections, and indulgences for the good of the composite community; and he consents to all the motto implies, *salus populi suprema est lex;* and, as no government can exist without law, the law-making power, within the limits of constitutional authority, must be recognized as the body to prescribe what is right and prohibit what is wrong. It is the very incarnation of the spirit of anarchy for a citizen to proclaim that like the heathen he is a law unto himself.

Our attention has been called to a newspaper report of an opinion delivered by the supreme court of New South Wales in the case of Mrs. Besant for the publication of a pamphlet on "The Law of Population," in which the court held that the defendant was within the pale of legitimate discussion of a subject of vital importance. We have not access to this pamphlet to determine the character of the language employed.

We can conceive, and are free to say, that the subject of the increase and the prevention of population might be publicly discussed, as stated in this opinion, "in a decent way," without coming under the ban of obscenity. This opinion states that "it is right to advocate in the abstract the expediency of checking the advancing tide of population; and it appears to me impossible to contend that the thing which tells how this may be done is obscene, if it goes no further than is necessary for this purpose." The scope of this language is to be restrained, presumably, by the facts of the particular case. If, however, it is to be taken as asserting that the publisher of a promiscuous newspaper may discuss the policy and the means of preventing conception, and that the language deemed essential to convey the meaning of the writer to the popular mind may be employed regardless of its broad vulgarity and obscenity, without legal responsibility, it cannot have my assent. The problem of population, and other questions of social ethics and the sexual relations, may be publicly discussed on such a high plane of philosophy, thought, and fitness of language as to make it legally unexceptional. They may be discussed so as to be plain, yet chaste, so as to be instructive and corrective without being coarse, vulgar, or seductive. But when such publication descends to the low plane of indecent illustrations and grossness of expression as adopted by Dr. O'Neill, it loses all claim to respectability. This article sets forth with a bluntness of speech and a baldness of immodesty of expression instances of bestiality and human depravity not at all germane to the subject of the sexual relations, which is the professed object of the publication of "Lucifer;" and when the defendant and his coadjutors say that such language and subject-matter are only impure to the overprudish it but illustrates how familiarity with obscenity blunts the sensibilities, depraves good taste, and perverts the judgment. To the pure all things are pure, is too poetical for the actualities of practical life. There is in the popular conception and heart such a thing as modesty. It was born in the Garden of Eden. After Adam and Eve ate of the fruit of the tree of knowledge they passed from that condition of perfectibility which some people nowadays aspire to, and, their eyes being opened, they discerned that there was both good and evil; "and they knew that they were naked; and they sewed fig leaves together, and made themselves aprons." From that day to this civilized man has carried with him the sense of shame,—the feeling that there were some things on which the eye—the mind—should not look; and where men and women become so depraved by the use, or so insensate from perverted education, that they will not veil their eyes, nor hold their tongues, the government should perform the office for them in protection of the social compact and the body politic.

The defendant has not exhibited in this case a willing and obedient mind to law, and cannot claim that he has acted unwittingly. After trial and conviction for a similar publication, and while that cause was on appeal, he made this publication, and after arrest, and pending trial herein before the commissioner, he again and again deposited in the post-office the same publication. We recognize his right to have the

validity of the law tested; but, pending the litigation, the spirit of good citizenship would have induced forbearance from repeating the alleged offense. Neither is this publication of Dr. O'Neill's defensible or justifiable on the ground that the evils detailed must find their correction through such a medium of discussion as the "Lucifer." They all come under the denunciation of common or statute law; and these declaimers would do more to suppress and prevent their repetition by having such miscreants arrested and prosecuted in the courts than by firing paper words at the acts. Such zeal can never reach martyrdom, for it is without that spirit which challenges admiration and popular intelligent respect. The responsibility for this statute rests upon congress. The duty of the courts is imperative to enforce it while it stands. My conclusion from the facts and the law is that the defendant is guilty, in manner and form, as charged in the first, third, and fourth counts of the indictment.