(64 Misc. Rep. 336.)

### ST. HUBERT GUILD v. QUINN.

(Supreme Court, Appellate Term.   June 29, 1909.)

1. SALES (§ 40*)—FRAUD OF SELLER—REPRESENTATIONS OF FACTS.
    The statement of the agent of a seller of books that the books are fine reading, fit for everybody, is a matter of opinion merely and is not a representation of a fact.
    [Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 67–83; Dec. Dig. § 40.*]

2. EVIDENCE (§ 437*)—PAROL EVIDENCE—ADMISSIBILITY.
    Parol evidence is competent to show that the consideration for a written contract is illegal.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2028; Dec. Dig. § 437.*]

3. SALES (§ 48*)—ILLEGAL CONTRACTS.
    A contract for the sale of books is not illegal because of the character of the books, unless their sale or publication violates Pen. Code, § 317, prohibiting the sale or publishing of immoral or obscene literature.
    [Ed. Note.—For other cases, see Sales, Dec. Dig. § 48.*]

4. SALES (§ 48*)—ILLEGAL CONTRACTS.
    As the object of the law prohibiting the sale or publication of immoral literature is to prevent the circulation of literature hurtful to the community, the law cannot be invoked against those works which have been generally recognized as literary classics; but contemporaneous literature must be judged by current opinion.
    [Ed. Note.—For other cases, see Sales, Dec. Dig. § 48.*]

5. EVIDENCE (§ 5*)—JUDICIAL NOTICE.
    Courts will take the same knowledge as the community at large of matters of literature.
    [Ed. Note.—For other cases, see Evidence, Dec. Dig. § 5.*]

6. SALES (§ 48*)—ILLEGAL CONTRACTS.
    A contract for the sale and purchase of the works of Voltaire is not illegal because of the character of the works.
    [Ed. Note.—For other cases, see Sales, Dec. Dig. § 48.*]

Appeal from Municipal Court, Borough of Manhattan, Ninth District.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Action by the St. Hubert Guild against Peter J. Quinn. From a judgment for defendant rendered in the Municipal Court of the City of New York, plaintiff appeals. Reversed, and new trial ordered.

Argued before GILDERSLEEVE, P. J., and GIEGERICH, and SEABURY, JJ.

Louis Sachs, for appellant.

H. M. Gescheidt, for respondent.

SEABURY, J. This action is brought to recover $200, the amount alleged to be due under a written contract under which the plaintiff sold and delivered to the defendant 42 volumes of the works of Voltaire. The defendant admits the making of the contract and the delivery of the books, but alleges that, at the time of the signing of the contract, it was agreed that the books were to be accepted only on approval of himself and family, and that these books "contain reading of a licentious, lascivious, and lewd character and not fit to be used or read in the defendant's family." No evidence was offered to show that the contract was made on condition that the books should only be accepted by the defendant provided that they met with his approval. The evidence, in reference to this alleged agreement, does not go further than to show that the plaintiff's agent in selling the books stated to the defendant that "they were very fine reading matter, fit for everybody to read." At best, this statement was mere matter of opinion and cannot be construed to be a representation of fact. The court below held that the contract was founded upon an illegal consideration, in that the books referred to were immoral, and rendered judgment for the defendant. Only 2 of the 42 volumes sold were offered in evidence, and these were "The Philosophical Dictionary" and "The Maid of Orleans." These two books were held to be of such a character as to condemn the whole set. From the two books offered in evidence, the court cannot draw any inference as to the other volumes which were sold.

The contention of the appellant that, because the contract for the sale of the books was in writing, oral evidence could not be offered to show that it was founded upon an illegal consideration, is untenable. Parol evidence is always competent to show that the consideration for a written contract is illegal. If a different rule prevailed, parties to illegal contracts could make them enforceable "by the simple device of putting them in writing, using such words as would conceal or omit the illegal objects intended by them to be accomplished." 2 Page on Contracts, § 1212.

The judgment, which the learned court below delivered, is not the first judicial determination which has condemned The Philosophical Dictionary. The last time it was judicially condemned, so far as I know, was in France in 1766, when, together with a youth who was suspected of an act of malicious mischief and in whose possession a copy of the book was found, it was publicly burned in the streets of Paris. The other work complained of, The Maid of Orleans, had a history less tragic, although sufficiently exciting to have given even the careless Voltaire many moments of anxiety for his own safety on account of it.

The Philosophical Dictionary is a collection of articles dealing with romance, history, science, and religion, many of which were originally contributed to the great Encyclopædia of which Diderot, D'Alembert, and Voltaire were the inspiration. It is not only a reservoir of sarcasm and wit, but it has exerted a profound influence in favor of a humane and rational administration of the law. For the other work offered in evidence, The Maid of Orleans, so much cannot be said. Offensive as some of the verses of this book undoubtedly are to the taste of our day, yet I do not think we can declare a contract for its sale illegal on this account. Its vices are those of its age. Frederick the Great admired it and paid it the doubtful compliment of imitation, and Condorcet regarded it only as an attack upon hypocrisy and superstition. Less prejudiced critics than these condemn it with severity, and even admirers of Voltaire regret that there are passages in it which have dimmed even the fame of its author. In passing judgment upon it, perhaps it is not too much to ask that it should be considered in the spirit which the author of "The Treatise On Tolerance" did so much to make general.

The judgment of the court below is based upon a few passages in each of these works, and these passages have been held to be of such a character as to invalidate the contract upon which the action has been brought. These few passages furnish no criterion by which the legality of the consideration of the contract can be determined. That some of these passages, judged by the standard of our day, mar rather than enhance the value of these books, can be admitted without condemning the contract for the sale of the books as illegal. The same criticism has been directed against many of the classics of antiquity and against the works of some of our greatest writers from Chaucer to Walt Whitman, without being regarded as sufficient to invalidate contracts for the sale or publication of their works.

The Penal Code of this state makes it a crime to sell or publish immoral or obscene literature (section 317, Pen. Code), and contracts for the sale or publication of immoral literature have been held to be illegal. 15 Am. & Eng. Ency. of Law (2d Ed.) p. 959; Stockdale v. Onwhyn, 5 B. & C. 173; 11 Eng. Com. Law R. 417; Fores v. Johnes, 4 Esp. 97.

The early attitude of the courts upon this subject discloses an illiberality of opinion which is not reflected in the recent cases. Perhaps no one was more responsible for this early position than Lord Eldon, who refused to protect by injunction Southey's Wat Tyler until the innocent character of the work was proved. Southey v. Sherwood, 2 Meriv. 437. He assumed a like position in reference to Byron's Cain (6 Petersdorff, Abr. 558, 559), and expressed a doubt (which he hoped was reasonable) as to the innocent character of Milton's Paradise Lost. When Dr. Johnson heard of some earlier opinions to the same effect, he is reported to have said:

"They make me think of your judges not with that respect which I should wish to do."

Judging from the fact that a jury held the publication of Shelley's Queen Mab to be an indictable offense (Moxon's Case, 2 Mod. S. T.

356), it seems that jurors were no more liberal than judges in these matters. In commenting upon some of Lord Eldon's judgments on the subject of literary property, Lord Campbell remarked that:

"It must have been a strange occupation for a judge who for many years had meddled with nothing more imaginative than an act of Parliament to determine in what sense the speculations of Adam, Eve, Cain, and Lucifer are to be understood." 10 Campbell's Lives of the Lord Chancellors, p. 257.

It is no part of the duty of courts to exercise a censorship over literary productions. I think it is clear that no contract for the sale of a book can be declared illegal because of the character of the book, unless its sale or publication violates the criminal law. This position was distinctly asserted in Traché v. Dérome, 6 Montreal Law Reports, Super. Ct. 178. In that case the defendants sought to defeat a claim upon a contract for the sale of copies of the works of Victor Hugo. It appeared from the evidence that Notre-Dame De Paris, Les Miserables, and Le Pape had been placed upon the Index Librorum Prohibitorum, and the defendant claimed that these works were immoral. In rendering judgment for the plaintiff, Mr. Justice Davidson said:

"As to English jurisprudence, it may be safely said that for all practical purposes the civil law is determined by and coextensive with the criminal law. The question in a given case is not simply whether the publication be immoral, but whether it is sufficiently so to enable the criminal law to punish it as such."

Under no reasonable construction can our law be held to declare the sale or publication of the works of Voltaire a crime. In re Worthington Co., 30 N. Y. Supp. 361, 24 L. R. A. 110, decided at the Special Term of the New York Supreme Court, Mr. Justice O'Brien directed a receiver appointed by the court to sell the following works: Payne's Edition of The Arabian Nights, Fielding's Novels, The Works of Rabelais, Ovid's Art of Love, The Decameron of Boccaccio, The Heptameron of Queen Margaret of Navarre, The Confessions of J. J. Rousseau, Tales from the Arabic, and Alladin. This order was made upon the application of the receiver of a publishing house and was opposed by the Society for the Suppression of Vice upon the same grounds as those which are urged in the case at bar. In authorizing the sale the court said:

"It is very difficult to see upon what theory these world-renowned classics can be regarded as specimens of that pornographic literature which it is the office of the Society for the Suppression of Vice to suppress; or how they can come under any stronger condemnation than that high standard literature which consists of the works of Shakespeare, of Chaucer, of Laurence Sterne, and of other great English writers, without making reference to many parts of the Old Testament Scriptures, which are to be found in almost every household in the land."

In view of this decision, the good sense of which is manifest, it would indeed be straining the rule of law to hold that the works of Voltaire come within its condemnation. If the works referred to in the opinion in the Worthington Company Case could be sold at a judicial sale by a receiver under the direction of the court, certainly the court could not declare that an agreement to sell the works of Voltaire

was founded upon an illegal consideration. The rule against the sale of immoral publications cannot be invoked against those works which have been generally recognized as literary classics. As was well said by Mr. Justice O'Brien, in the Worthington Company Case, supra:

"What has become standard literature of the English language—has been wrought into the very structure of our splendid English literature—is not to be pronounced at this late day unfit for publication or circulation and stamped with judicial disapprobation as hurtful to the community."

Contemporaneous literature must, of course, be judged by current opinion, and the test to be applied does not require the testimony of experts, but is one falling within the range of ordinary intelligence. People v. Muller, 96 N. Y. 408, 48 Am. Rep. 635. It is not at all inconceivable, and has frequently been the case, that the works which receive the condemnation of one generation are the objects of veneration and praise in another. Courts will take the same knowledge as the community at large of matters of literature (16 Cyc. 854), and we cannot fail to recognize that the genius of Voltaire has enriched many fields of knowledge. The object of the law which prohibits the sale or publication of immoral literature is to prevent the circulation of literature which is hurtful to the community. To apply this rule so as to prohibit the sale or publication of the works of Voltaire would not give effect to its purpose. Differ as men may as to the views of Voltaire on many questions, none can deny the great influence of his work in promoting justice and humanity and the reign of reason in public affairs. In speaking of the service rendered by Voltaire to this cause in the "Philosophical Dictionary" and some of his other works, Mr. Lecky has finely said of him that:

"When attacking intolerance, he employed, indeed, every weapon, but he employed them all with the concentrated energy of a profound conviction. His success was equal to his zeal. The spirit of intolerance sank blasted beneath his genius. Wherever his influence passed the arm of the inquisitor was palsied, the chain of the captive riven, the prison door flung open. Beneath his withering irony persecution appeared not only criminal but loathsome, and since his time it has ever shrunk from observation, and masked its features under other names. He died, leaving a reputation that is indeed far from spotless, but having done more to destroy the greatest of human curses than any other of the sons of men." Rationalism in Europe, vol. 2, p. 71.

The contract sued upon was a valid contract, and no defense to the action upon it was proved.

The judgment is reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.