UNITED STATES v. ONE BOOK ENTITLED ULYSSES BY JAMES JOYCE (RANDOM HOUSE, Inc., Claimant).

No. 459.

Circuit Court of Appeals, Second Circuit.

Aug. 7, 1934.

*Writ of certiorari denied 55 S. Ct. 216, 79 L. Ed. —.

MANTON, Circuit Judge, dissenting.

Martin Conboy, U. S. Atty., of New York City (Martin Conboy, of New York City, Francis H. Horan, of Washington, D. C., and John F. Davidson, Asst. U. S. Attys., of New York City, of counsel), for libelant-appellant.

Greenbaum, Wolff & Ernst, of New York City (Morris L. Ernst and Alexander Lindey, both of New York City, of counsel), for claimant-appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This appeal raises sharply the question of the proper interpretation of section 305 (a) of the Tariff Act of 1930 (19 USCA § 1305 (a). That section provides that "all persons are prohibited from importing into the United States from any foreign country * * * any obscene book, pamphlet, paper, writing, advertisement, circular, print, picture, drawing, or other representation, figure, or image on or of paper or other material, * * * " and directs that, upon the appearance of any such book or matter at any customs office, the collector shall seize it and inform the district attorney, who shall institute proceedings for forfeiture. In accordance with the statute, the collector seized Ulysses, a book written by James Joyce, and the United States filed a libel for forfeiture. The claimant, Random House, Inc., the publisher of the American edition, intervened in the cause and filed its answer denying that the book was obscene and was subject to confiscation and praying that

it be admitted into the United States. The case came on for trial before Woolsey, J., who found that the book, taken as a whole, "did not tend to excite sexual impulses or lustful thoughts but that its net effect * * * was only that of a somewhat tragic and very powerful commentary on the inner lives of men and women." He accordingly granted a decree adjudging that the book was "not of the character the entry of which is prohibited under the provision of section 305 of the Tariff Act of 1930 * * * and * * * dismissing the libel," from which this appeal has been taken.

James Joyce, the author of Ulysses, may be regarded as a pioneer among those writers who have adopted the "stream of consciousness" method of presenting fiction, which has attracted considerable attention in academic and literary circles. In this field Ulysses is rated as a book of considerable power by persons whose opinions are entitled to weight. Indeed it has become a sort of contemporary classic, dealing with a new subject-matter. It attempts to depict the thoughts and lay bare the souls of a number of people, some of them intellectuals and some social outcasts and nothing more, with a literalism that leaves nothing unsaid. Certain of its passages are of beauty and undoubted distinction, while others are of a vulgarity that is extreme and the book as a whole has a realism characteristic of the present age. It is supposed to portray the thoughts of the principal characters during a period of about eighteen hours.

We may discount the laudation of Ulysses by some of its admirers and reject the view that it will permanently stand among the great works of literature, but it is fair to say that it is a sincere portrayal with skillful artistry of the "streams of consciousness" of its characters. Though the depiction happily is not of the "stream of consciousness" of all men and perhaps of only those of a morbid type, it seems to be sincere, truthful, relevant to the subject, and executed with real art. Joyce, in the words of Paradise Lost, has dealt with "things unattempted yet in prose or rime"—with things that very likely might better have remained "unattempted"—but his book shows originality and is a work of symmetry and excellent craftsmanship of a sort. The question before us is whether such a book of artistic merit and scientific insight should be regarded as "obscene" within section 305 (a) of the Tariff Act.

That numerous long passages in Ulysses contain matter that is obscene under any fair

definition of the word cannot be gainsaid; yet they are relevant to the purpose of depicting the thoughts of the characters and are introduced to give meaning to the whole, rather than to promote lust or portray filth for its own sake. The net effect even of portions most open to attack, such as the closing monologue of the wife of Leopold Bloom, is pitiful and tragic, rather than lustful. The book depicts the souls of men and women that are by turns bewildered and keenly apprehensive, sordid and aspiring, ugly and beautiful, hateful and loving. In the end one feels, more than anything else, pity and sorrow for the confusion, misery, and degradation of humanity. Page after page of the book is, or seems to be, incomprehensible. But many passages show the trained hand of an artist, who can at one moment adapt to perfection the style of an ancient chronicler, and at another become a veritable personification of Thomas Carlyle. In numerous places there are found originality, beauty, and distinction. The book as a whole is not pornographic, and, while in not a few spots it is coarse, blasphemous, and obscene, it does not, in our opinion, tend to promote lust. The erotic passages are submerged in the book as a whole and have little resultant effect. If these are to make the book subject to confiscation, by the same test Venus and Adonis, Hamlet, Romeo and Juliet, and the story told in the Eighth Book of the Odyssey by the bard Demodocus of how Ares and Aphrodite were entrapped in a net spread by the outraged Hephaestus amid the laughter of the immortal gods, as well as many other classics, would have to be suppressed. Indeed, it may be questioned whether the obscene passages in Romeo and Juliet were as necessary to the development of the play as those in the monologue of Mrs. Bloom are to the depiction of the latter's tortured soul.

It is unnecessary to add illustrations to show that, in the administration of statutes aimed at the suppression of immoral books, standard works of literature have not been barred merely because they contained *some* obscene passages, and that confiscation for such a reason would destroy much that is precious in order to benefit a few.

It is settled, at least so far as this court is concerned, that works of physiology, medicine, science, and sex instruction are not within the statute, though to some extent and among some persons they may tend to promote lustful thoughts. United States v. Dennett, 39 F.(2d) 564, 76 A. L. R. 1092. We think the same immunity should apply to literature as to science, where the presentation, when viewed objectively, is sincere, and the erotic matter is not introduced to promote lust and does not furnish the dominant note of the publication. The question in each case is whether a publication taken as a whole has a libidinous effect. The book before us has such portentous length, is written with such evident truthfulness in its depiction of certain types of humanity, and is so little erotic in its result, that it does not fall within the forbidden class.

In Halsey v. New York Society for Suppression of Vice, 234 N. Y. 1, 136 N. E. 219, 220, the New York Court of Appeals dealt with Mademoiselle de Maupin, by Theophile Gautier, for the sale of which the plaintiff had been prosecuted under a New York statute forbidding the sale of obscene books, upon the complaint of the defendant. After acquittal, the plaintiff sued for malicious prosecution, and a jury rendered a verdict in his favor. The Court of Appeals refused to disturb the judgment because the book had become a recognized French classic and its merits on the whole outweighed its objectionable qualities, though, as Judge Andrews said, it contained many paragraphs which, "taken by themselves," were "undoubtedly vulgar and indecent." In referring to the obscene passages, he remarked that: "No work may be judged from a selection of such paragraphs alone. Printed by themselves they might, as a matter of law, come within the prohibition of the statute. So might a similar selection from Aristophanes or Chaucer or Boccaccio, or even from the Bible. The book, however, must be considered broadly, as a whole." We think Judge Andrews was clearly right, and that the effect of the book as a whole is the test.

In the New York Supreme Court, Judge Morgan J. O'Brien declined to prohibit a receiver from selling Arabian Nights, Rabelais, Ovid's Art of Love, the Decameron of Boccaccio, the Heptameron of Queen Margaret of Navarre, or the Confessions of Rousseau. He remarked that a rule which would exclude them would bar "a very large proportion of the works of fiction of the most famous writers of the English language." In re Worthington Co. (Sup.) 30 N. Y. S. 361, 362, 24 L. R. A. 110. The main difference between many standard works and Ulysses is its far more abundant use of coarse and colloquial words and presentation of dirty scenes, rather than in any excess of prurient suggestion. We do not think that Ulysses, taken as a whole, tends to promote lust, and its criti-

cised passages do this no more than scores of standard books that are constantly bought and sold. Indeed a book of physiology in the hands of adolescents may be more objectionable on this ground than almost anything else.

But it is argued that United States v. Bennett, Fed. Cas. No. 14,571, stands in the way of what has been said, and it certainly does. There a court, consisting of Blatchford, C. J., and Benedict and Choate, D.JJ., held that the offending paragraphs in a book could be taken from their context and the book judged by them alone, and that the test of obscenity was whether the tendency of these passages in themselves was "to deprave the minds of those open to such influences and into whose hands a publication of this character might come." The opinion was founded upon a dictum of Cockburn, C. J., in Regina v. Hicklin, L. R. 3 Q. B. 360, where half of a book written to attack alleged practices of the confession was obscene and contained, as Mellor, J., said, "a great deal ° * * . which there cannot be any necessity for in any legitimate argument on the confessional. * * * " It is said that in Rosen v. United States, 161 U. S. 29, 16 S. Ct. 434, 480, 40 L. Ed. 606, the Supreme Court cited and sanctioned Regina v. Hicklin, and United States v. Bennett. The subject-matter of Rosen v. United States was, however, a pictorial representation of "females, in different attitudes of indecency." The figures were partially covered "with lamp black, that could be easily erased with a piece of bread." Page 31 of 161 U. S., 16 S. Ct. 434. The pictures were evidently obscene, and plainly came within the statute prohibiting their transportation. The citation of Regina v. Hicklin and United States v. Bennett, was in support of a ruling that allegations in the indictment as to an obscene publication need only be made with sufficient particularity to inform the accused of the nature of the charge against him. No approval of other features of the two decisions was expressed, nor were such features referred to. Dunlop v. United States, 165 U. S. 486, 489, 17 S. Ct. 375, 41 L. Ed. 799, also seems to be relied on by the government, but the publication there was admittedly obscene and the decision in no way sanctioned the rulings in United States v. Bennett which we first mentioned. The rigorous doctrines laid down in that case are inconsistent with our own decision in United States v. Dennett (C. C. A.) 39 F.(2d) 564, 76 A. L. R. 1092, as well as with Konda v. United States (C. C. A.) 166 F. 91, 92, 22 L.

R. A. (N. S.) 304; Clark v. United States (C. C. A.) 211 F. 916, 922; Halsey v. N. Y. Society for Suppression of Vice, 234 N. Y. 1, 4, 136 N. E. 219; and St. Hubert Guild v. Quinn, 64 Misc. 336, 339, 118 N. Y. S. 582, and, in our opinion, do not represent the law. They would exclude much of the great works of literature and involve an impracticability that cannot be imputed to Congress and would in the case of many books containing obscene passages inevitably require the court that uttered them to restrict their applicability.

It is true that the motive of an author to promote good morals is not the test of whether a book is obscene, and it may also be true that the applicability of the statute does not depend on the persons to whom a publication is likely to be distributed. The importation of obscene books is prohibited generally, and no provision is made permitting such importation because of the character of those to whom they are sold. While any construction of the statute that will fit all cases is difficult, we believe that the proper test of whether a given book is obscene is its dominant effect. In applying this test, relevancy of the objectionable parts to the theme, the established reputation of the work in the estimation of approved critics, if the book is modern, and the verdict of the past, if it is ancient, are persuasive pieces of evidence; for works of art are not likely to sustain a high position with no better warrant for their existence than their obscene content.

It may be that Ulysses will not last as a substantial contribution to literature, and it is certainly easy to believe that, in spite of the opinion of Joyce's laudators, the immortals will still reign, but the same thing may be said of current works of art and music and of many other serious efforts of the mind. Art certainly cannot advance under compulsion to traditional forms, and nothing in such a field is more stifling to progress than limitation of the right to experiment with a new technique. The foolish judgments of Lord Eldon about one hundred years ago, proscribing the works of Byron and Southey, and the finding by the jury under a charge by Lord Denman that the publication of Shelley's "Queen Mab" was an indictable offense are a warning to all who have to determine the limits of the field within which authors may exercise themselves. We think that Ulysses is a book of originality and sincerity of treatment and that it has not the effect of promoting lust. Accordingly it does

not fall within the statute, even though it justly may offend many.

Decree affirmed.

MANTON, Circuit Judge.

I dissent. This libel, filed against the book Ulysses prays for a decree of forfeiture, and it is based upon the claim that the book's entry into the United States is prohibited by section 305 (a) of the Tariff Act of 1930 (19 USCA 1305 (a). On motion of appellee, the court below entered an order dismissing the libel, and the collector of customs was ordered to release the book. The motion was considered on the pleadings and a stipulation entered into by the parties.

The sole question presented is whether or not the book is obscene within section 305 (a) which provides:

"All persons are prohibited from importing into the United States from any foreign country * * * any obscene book, pamphlet, paper, writing, advertisement, circular, print, picture, drawing, or other representation, figure, or image on or of paper or other material. * * *

"Upon the appearance of any such book or matter at any customs office, the same shall be seized and held by the collector to await the judgment of the district court as hereinafter provided. * * * Upon the seizure of such book or matter the collector shall transmit information thereof to the district attorney of the district in which is situated the office at which such seizure has taken place, who shall institute proceedings in the district court for the forfeiture, confiscation, and destruction of the book or matter seized. * * *

"In any such proceeding any party in interest may upon demand have the facts at issue determined by a jury and any party may have an appeal or the right of review as in the case of ordinary actions or suits."

The parties agreed as to the facts in the stipulation. There is no conflicting evidence; the decision to be made is dependent entirely upon the reading matter found on the objectionable pages of the book (pages 173, 213, 214, 359, 361, 423, 424, 434, 467, 488, 498, 500, 509, 522, 526, 528, 551, 719, 724–727, 731, 738, 739, 745, 746, 754–756, 761, 762, 765, Random House Edition). The book itself was the only evidence offered.

In a suit of this kind upon stipulation, the ultimate finding based solely on stipulated facts is reviewable on appeal to determine whether the facts support the finding. Lumbermen's Trust Co. v. Town of Ryegate, 61

F.(2d) 14 (C. C. A. 9); Order of United Commercial Travelers of America v. Shane, 64 F.(2d) 55 (C. C. A. 8). Moreover, the procedure in this suit in rem conforms to that obtaining in suits in admiralty (Coffey v. United States, 117 U. S. 233, 6 S. Ct. 717, 29 L. Ed. 890) where the appellate courts may review the facts. The Africa Maru, 54 F.(2d) 265 (C. C. A. 2); The Perry Setzer, 299 F. 586 (C. C. A. 2).

Who can doubt the obscenity of this book after a reading of the pages referred to, which are too indecent to add as a footnote to this opinion? Its characterization as obscene should be quite unanimous by all who read it.

In the year 1868 in Regina v. Hicklin L. R., 3 Q. B. 359, at page 369, Cockburn C. J., stated that "the test of obscenity is this, whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall."

In 1879, in United States v. Bennett, Fed. Cas. No. 14,571 Judge Blatchford, later a justice of the Supreme Court, in this circuit, sitting with Judges Choate and Benedict, approved the rule of the Hicklin Case and held a charge to a jury proper which embodied the test of that case. The Bennett Case clearly holds the test of obscenity, within the meaning of the statute, is "whether the tendency of the matter is to deprave and corrupt the morals of those whose minds are open to such influences, and into whose hands a publication of this sort may fall." The court held that the object of the use of the obscene words was not a subject for consideration.

Judge Blatchford's decision met with approval in Rosen v. United States, 151 U. S. 29, 16 S. Ct. 434, 438, 480, 40 L. Ed. 606. The court had under consideration an indictment charging the accused with depositing obscene literature in the mails. There instructions to the jury requested that conviction could not be had although the defendant may have had knowledge or notice of the contents of the letter "unless he knew or believed that such paper could be properly or justly characterized as obscene, lewd, and lascivious." The court said the statute was not to be so interpreted. "The inquiry under the statute is whether the paper charged to have been obscene, lewd, and lascivious was in fact of that character; and if it was of that character, and was deposited in the mail by one who knew or had notice at the time of its contents, the offense is complete, although the defendant himself did not regard the paper as one

that the statute forbade to be carried in the mails. Congress did not intend that the question as to the character of the paper should depend upon the opinion or belief of the person who, with knowledge or notice of its contents, assumed the responsibility of putting it in the mails of the United States. The evils that congress sought to remedy would continue and increase in volume if the belief of the accused as to what was obscene, lewd, and lascivious were recognized as the test for determining whether the statute has been violated. Every one who uses the mails of the United States for carrying papers or publications must take notice of what, in this enlightened age, is meant by decency, purity, and chastity in social life, and what must be deemed obscene, lewd, and lascivious."

Further the Supreme Court approved the test of the Hicklin Case. On page 43 of 151 U. S., 16 S. Ct. 434, 439, the court states: "That was what the court did when it charged the jury that 'the test of obscenity is whether the tendency of the matter is to deprave and corrupt the morals of those whose minds are open to such influence, and into whose hands a publication of this sort may fall.' 'Would it,' the court said, 'suggest or convey lewd thoughts and lascivious thoughts to the young and inexperienced?' In view of the character of the paper, as an inspection of it will instantly disclose, the test prescribed for the jury was quite as liberal as the defendant had any right to demand."

Again the Supreme Court in Dunlop v. United States, 165 U. S. 486, 17 S. Ct. 375, 380, 41 L. Ed. 799, reviewed a charge in a criminal case upon the subject of obscene publications as follows: "Now, what is (are) obscene, lascivious, lewd, or indecent publications is largely a question of your own conscience and your own opinion; but it must come—before it can be said of such literature or publication—it must come up to this point: that it must be calculated with the ordinary reader to deprave him, deprave his morals, or lead to impure purposes. * * * It is your duty to ascertain, in the first place, if they are calculated to deprave the morals; if they are calculated to lower that standard which we regard as essential to civilization; if they are calculated to excite those feelings which, in their proper field, are all right, but which, transcending the limits of that proper field, play most of the mischief in the world."

In approving the charge, the court said: "The alleged obscene and indecent matter consisted of advertisements by women, soliciting or offering inducements for the visits of men, usually 'refined gentlemen,' to their rooms, sometimes under the disguise of 'Baths' and 'Massage,' and oftener for the mere purpose of acquaintance. It was in this connection that the court charged the jury that, if the publications were such as were calculated to deprave the morals, they were within the statute. There could have been no possible misapprehension on their part as to what was meant. There was no question as to depraving the morals in any other direction than that of impure sexual relations. The words were used by the court in their ordinary signification, and were made more definite by the context and by the character of the publications which have been put in evidence. The court left to the jury to say whether it was within the statute, and whether persons of ordinary intelligence would have any difficulty of divining the intention of the advertiser."

Thus the court sustained a charge having a test as to whether or no the publications depraved the morals of the ordinary reader or tended to lower the standards of civilization. The tendency of the matter to deprave and corrupt the morals of those whose minds are open to such influence and into whose hands the publication of this sort may fall, has become the test thoroughly entrenched in the federal courts. United States v. Bebout (D. C.) 28 F. 522; United States v. Wightman (D. C.) 29 F. 636; United States v. Clarke (D. C.) 38 F. 732; United States v. Smith (D. C.) 45 F. 476; Burton v. United States, 142 F. 57 (C. C. A. 8); United States v. Dennett, 39 F.(2d) 564, 76 A. L. R. 1092 (C. C. A. 2). What is the probable effect on the sense of decency of society, extending to the family made up of men, women, young boys, and girls, was said to be the test in United States v. Harmon (D. C.) 45 F. 414, 417.

Ulysses is a work of fiction. It may not be compared with books involving medical subjects or description of certain physical or biological facts. It is written for alleged amusement of the reader only. The characters described in the thoughts of the author may in some instances be true, but, be it truthful or otherwise, a book that is obscene is not rendered less so by the statement of truthful fact. Burton v. United States, supra. It cannot be said that the test above has been rejected by United States v. Dennett (C. C. A.) 39 F.(2d) 564, 76 A. L. R. 1092, nor can that case be taken to mean that the book is to be judged as a whole. If anything, the case clearly recognizes that the

book may be obscene because portions thereof are so, for pains are taken to justify and show not to be obscene portions to which objection is made. The gist of the holding is that a book is not to be declared obscene if it is "an accurate exposition of the relevant facts of the sex side of life in decent language and in manifestly serious and disinterested spirit." A work of obvious benefit to the community was never intended to be within the purview of the statute. No matter what may be said on the side of letters, the effect on the community can and must be the sole determining factor. "Laws of this character are made for society in the aggregate, and not in particular. So, while there may be individuals and societies of men and women of peculiar notions or idiosyncrasies, whose moral sense would neither be depraved nor offended, * * * yet the exceptional sensibility, or want of sensibility, of such cannot be allowed as a standard." United States v. Harmon, supra.

In United States v. Kennerley (D. C.) 209 F. 119, the Bennett Case was followed despite the dictum objecting to a test which protected the "salacious" few. By the very argument used, to destroy a test which protects those most easily influenced, we can discard a test which would protect only the interests of the other comparatively small groups of society. If we disregard the protection of the morals of the susceptible, are we to consider merely the benefits and pleasures derived from letters by those who pose as the more highly developed and intelligent? To do so would show an utter disregard for the standards of decency of the community as a whole and an utter disregard for the effect of a book upon the average less sophisticated member of society, not to mention the adolescent. The court cannot indulge any instinct it may have to foster letters. The statute is designed to protect society at large, of that there can be no dispute; notwithstanding the deprivation of benefits to a few, a work must be condemned if it has a depraving influence.

And are we to refuse to enforce the statute Congress has enacted because of the argument that "obscenity is only the superstition of the day—the modern counterpart of ancient witchcraft"? Are we to be persuaded by the statement, set forth in the brief, made by the judge below in an interview with the press, "Education, not law, must solve problems of taste and choice (of books)," when the statute is clear and our duty plain?

The prevailing opinion states that classics would be excluded if the application of the statute here argued for prevailed. But the statute, Tariff Act 1930, § 305 (a), 19 USCA § 1305 (a), provides as to classics that they may be introduced into the commerce of the United States provided "that the Secretary of the Treasury * * * in his discretion, admit the so-called classics or books of recognized and established literary or scientific merit, but may, in his discretion, admit such classics or books only when imported for noncommercial purposes." The right to admission under this proviso was not sought nor is it justified by reason thereof in the prevailing opinion.

Congress passed this statute against obscenity for the protection of the great mass of our people; the unusual literator can, or thinks he can, protect himself. The people do not exist for the sake of literature, to give the author fame, the publisher wealth, and the book a market. On the contrary, literature exists for the sake of the people, to refresh the weary, to console the sad, to hearten the dull and downcast, to increase man's interest in the world, his joy of living, and his sympathy in all sorts and conditions of men. Art for art's sake is heartless and soon grows artless; art for the public market is not art at all, but commerce; art for the people's service is a noble, vital, and permanent element of human life.

The public is content with the standard of salability; the prigs with the standard of preciosity. The people need and deserve a moral standard; it should be a point of honor with men of letters to maintain it. Masterpieces have never been produced by men given to obscenity or lustful thoughts—men who have no Master. Reverence for good work is the foundation of literary character. A refusal to imitate obscenity or to load a book with it is an author's professional chastity.

Good work in literature has its permanent mark; it is like all good work, noble and lasting. It requires a human aim—to cheer, console, purify, or ennoble the life of people. Without this aim, literature has never sent an arrow close to the mark. It is by good work only that men of letters can justify their right to a place in the world.

Under the authoritative decisions and considering the substance involved in this appeal, it is my opinion that the decree should be reversed.