HORSLEY v. MODZELEWSKI.

(Circuit Court of Appeals, Third Circuit. February 9, 1915.)

No. 1870.

SHIPPING ☞84—LIABILITY FOR DEATH OF STEVEDORE—DEFECTIVE APPLIANCE.

Conflicting evidence considered, and *held* insufficient to establish the liability of a shipowner for the death of a stevedore's employé, who was killed by the failing of a tub of ore being hoisted from the hold by means of a wire rope, which broke, on the ground of negligence in supplying a rope which was defective and insufficient in strength, but to show by a decided preponderance that the rope was made by an English manufacturer of high standing, was tested in course of manufacture, and afterward according to Lloyd's regulations, and found of sufficient strength to sustain a much greater weight than that placed upon it, that it was new, and had been used but once, a few days before, when it was subjected to but a slight strain, that it was inspected by several officers before use on this occasion and found in perfect condition, and to show without contradiction that no defect was noticed in it by the winchman, hatch tender, or foreman of stevedores before it broke.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 342, 349–351; Dec. Dig. ☞84.]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Joseph Buffington, Judge.

Suit in admiralty by Franciska Modzelewski against M. H. Horsley, as owner of the British steamship Eastwood. Decree for libelant, and respondent appeals. Reversed.

Convers & Kirlin and Charles R. Hickox, both of New York City, and Edward F. Pugh, of Philadelphia, Pa., for appellant.

Howard M. Long, of Philadelphia, Pa., for appellee.

Before HUNT, McPHERSON and WOOLLEY, Circuit Judges.

J. B. McPHERSON, Circuit Judge. This is an action in personam by Franciska Modzelewski against M. H. Horsley, who was averred to be the owner of the British steamship Eastwood. It was begun by foreign attachment, and the respondent afterwards appeared and made defense.

On Tuesday, December 14, 1909, the libelant's husband, a laborer engaged in discharging the cargo of the steamship at Philadelphia, was killed by the fall of a tub or bucket loaded with iron ore, weighing altogether about a ton. He had been at work in the hold, and the tub fell upon him while the winch was hoisting it out of No. 1 hatch. We shall assume that he died on the ship. The libelant sued under the Pennsylvania statute, and recovered damages on the ground that the wire rope to which the tub was attached "was not in proper condition, that the ship had notice of that fact, and that its failure to provide a suitable rope caused the accident." This quotation from the opinion below states briefly the essence of the libel, which charges the respondent with furnishing a rope that was "defective, unsafe, improper, and not sufficiently strong," and avers that, although the condition of the rope

could have been discovered "by ordinary care and diligence and by reasonable inspection," nevertheless "the respondent and his agents wholly neglected their duty," etc.

The libel was filed and the attachment issued in the following July; but the actual seizure of the ship was waived, and bond was entered by the master on behalf of the respondent. It was clearly proved that the Horsley Line, Limited, a British association, and not Horsley as an individual, was the owner of the steamship; but the trial judge held the respondent estopped to deny that he himself was the owner. This is one of the errors assigned, but we need not consider it, as we think the case should be decided on another ground. The witnesses were all examined by deposition, so that the case is presented to us just as it was presented to the court below. The Santa Rita, 176 Fed. 893, 100 C. C. A. 360, 30 L. R. A. (N. S.) 1210.

The ship had nothing to do with the work of discharging, except to furnish the winch and the wire rope and some other appliances at each hatch. The rope in question—which was nearly new, and of the usual type and size—broke at a point about 63 feet from the tub, between the winch and the gin block, the upper block of the derrick. It had been made by an English firm of the highest standing in the trade, and had been thoroughly tested in the course of manufacture. It was composed of 6 strands around a main hemp core, and each of these strands had its own hemp core, surrounded by a double layer of galvanized crucible steel wires, 14 outer over 8 inner wires. The rope therefore was made up of 132 wires and 7 hemp cores. It had been tested according to Lloyds' regulations, both for torsion and for tensile strength. Each of the wires had been subjected to a torsion test of 43 twists in 8 inches, and to a tensile strain of 360 pounds. The completed rope, therefore, would sustain a breaking strain of more than 19 tons, and since the safe load of such a rope is estimated to be from one-seventh to one-tenth of the breaking strain, a large factor of safety was left, so that the rope was abundantly capable of sustaining and raising a load of from 1½ to 2 tons. It had been supplied to the ship in June, 1909, and after being oiled had been stored in the forepeak for several months. Toward the end of November it was used for the first time at Santiago, Cuba, not for cargo, but merely to lift some of the beams from the hatches. It was then oiled again and stored in the peak during the voyage of eight or nine days from Santiago to Philadelphia. It had been inspected in Cuba, and was inspected a second time on December 10, the day before the vessel reached Philadelphia, at which time it was rove into place in order to be in readiness for unloading. It was also inspected by the foreman of the stevedores early on Monday, December 13, before the actual work began, and on each of these three occasions it was found to be in excellent condition. And, although it had been used for about a day and a half in Philadelphia before the accident, nothing wrong was observed at any time either by the winchman or by the hatch tender.

It does not satisfactorily appear why the rope broke. Two or three theories are advanced, but we need not enter the field of conjecture. Unless sufficient evidence is present to establish the negligence of the

respondent or his agents, we must accept this deplorable occurrence as an unexplained accident, for which no recovery can be had in this action. And no evidence of negligence exists, except in the testimony of two witnesses, upon which (for reasons to be given as briefly as possible) we do not feel able to rely with confidence.

As already stated, the libel was not filed until July 18, 1910. On the next day, July 19, the master and the second officer were examined by deposition and testified inter alia to the following effect: The second officer deposed that he had been on duty at Santiago and had seen the rope taken out of the forepeak; it was new, and was only used on that occasion to lift the beams and hatches; his business was to handle such ropes, and he saw this particular rope several times in Santiago; it was not broken in any way, even slightly; he had handled it there, and had observed it while in the discharge of his duty; he had also examined the self-lubricating blocks through which the rope ran, and found them in excellent condition; the rope had then been taken down, and had been put up again the day before the ship's arrival in Philadelphia; he had also greased the rope down by the winch while it was being used here, and had found nothing the matter with it. The master testified: That the rope had been supplied on June 2, 1909, and had never been used before the ship reached Santiago; there it had merely lifted the beams out of the hatches, and had then been oiled and stored in the peak; on the day preceding the ship's arrival in Philadelphia it had been taken out of the peak and rove to the winch at No. 1 hatch; the standing orders on board the ship were that every rope must be examined before it was used for cargo, and the officers must report any defects or anything wrong with the ropes at any time; the examination was usually made by the first officer and the boatswain, and the custom was to lay the rope along the deck so that it could be thoroughly examined; he had had this rope in his own hands, and had looked it over fathom by fathom; no one made any complaint about it, and he himself had found it in good condition; such rope is subject to government inspection in England, and cannot be used unless it is certified by official inspectors.

The boatswain and first officer had left the ship in the preceding January, and the whereabouts of the boatswain was not discovered. But the first officer was found, and on April 10, 1911, he testified as follows: The rope came on board in June, 1909, and was then absolutely new; it was immediately placed in the forepeak, and was used for the first time at Santiago, simply for the purpose of lifting the hatch beams during fine weather; it was then put away again in the peak, where it remained until it was rove to the winch just before arrival in Philadelphia; he himself inspected it in Santiago, and afterwards when it was rigged here, and it gave no evidence of rust, or chafe, or of any other defect; several persons handled it, but he spoke of its condition from his own knowledge; no one reported the rope to him as being unsafe or not in proper condition, and no other inspection of the rope could have been made than was actually made; the condition of the blocks also was good, and he had been close to the rope when it was uncoiled and put through the blocks, so that he could see, and had seen, for himself.

Up to this time no testimony had been offered by the libelant bearing upon the condition of the rope, but on June 29, 1911, she called the hatch tender. His duty, of course, required him to be within a few feet of the rope, which had thus been under his observation for more than a day before the accident happened. He testified that the rope was up when he went to work, and that he had never looked at it; he did not see that anything was the matter with it, and it looked all right to him; it was no part of his duty to examine the rope, as the ship supplied it, but if he had seen anything the matter with it he would have stopped the work and made complaint. He repeated that he had not examined the rope himself, and evidently he had seen nothing to suggest that the rope was defective or unsafe. On the same day the winchman, who was also required to be within a few feet of the rope, testified upon the libelant's call that so far as he noticed nothing was the matter with the rope; if he had seen anything wrong, he would have given notice of the defect; as far as he could see, it was working all right; the rope looked as if it had been used before; it was not as bright as new rope; it was neither very rusty nor very bright.

Nothing more was done until February 23, 1912, when the libelant called Alexander Fritzberg, one of the two witnesses upon whom her case must rest. It was not until his redirect examination that he said anything about the defective appearance of the rope, and we cannot help noting as an unusual circumstance that, although this testimony was of the greatest importance to the libelant, the witness gave no hint of it, either on direct or on cross examination. He was assistant to the foreman in charge of the stevedores, and was "just on the wharf looking around," when the accident took place. He was then asked on direct examination:

"Q. Did you look at this rope that was broken?
"A. I looked, but I didn't examine it. * * *
"Q. Did you get hold of this rope after the accident, and look over it at all?
"A. I didn't examine it."

And on cross-examination he testified as follows:

"Q. I understood you to say, Mr. Fritzberg, that it was your province to inspect—to look at—the different ropes and machinery?
"A. But not on the ship. If I see it sometimes, helping the ship's crew, I tell them; but it is not my business to do it.
"Q. You did not see anything the matter with this rope, or you would have told them?
"A. I didn't examine them; it was not my business.
"Q. If you would have seen it, you would have told them?
"A. Yes, sir.
"Q. You didn't say anything about it before the accident?
"A. No, sir."

This would seem to be definite enough, but after he had been under re-examination on other matters for some time he was asked again, "Was this rope, the ship's rope, which broke, was that a new rope or an old rope"? and he then proceeded to testify in detail and for the first time that the rope was not new; he could see on the wire that some yarns or strands were shaved off, and that the rope broke at that place. He also said that he had seen the broken rope while he was

down in the hold helping to attend to Modzelewski, saying then that the break in the rope was about 15 feet from the tub—"about 15 feet away from the end, * * * (from) both ends, center parted near" —but declaring soon afterwards that "I didn't examine it exactly where it was broke; when I rigged up the ship for the discharging of the cargo I saw the wire," adding that he saw that the rope was worn when he "reeved the rope through." Upon recross-examination he testified that he saw this defective condition "when I started the ship," evidently meaning by that when the ship began unloading on the preceding day. He did not put up the rope himself, although he seems to say so in part of his testimony; but he says distinctly that he noticed its condition at the time when he "started the ship." He did not object to using it—"the ship is responsible for its gear; I have nothing to do with that"—saying that he had told nobody that it was chafed, as that was not his business; he didn't know whether the rope was sufficiently chafed to make it dangerous for use; he thought it was "good enough; I didn't think it was as dangerous as that; * * * I don't know how strong the wire was; I didn't examine." He repeated that he did not think it was dangerous, and said that he had told no one about it, and that nobody had said anything to him about it.

"Q. Whom did you first tell that you saw a chafed place in this rope? A. I didn't say it to nobody yet. Q. This is the first time you said it to anybody? A. Yes, sir; nobody asked me anything about it."

On March 2, a few days after Fritzberg's examination, Frank Fisher, the other witness, was called. He was a repairman in the employ of the contracting stevedore, but had nothing to do with looking after the tackle on the ship. He said he had seen the broken rope down in the hold, but had made no examination of it; "I seen it laying there, that's all." He testified further, however, that he had noticed the condition of the rope when "the ship started," or soon after, and that it then "looked pretty bad—it was splintered." He then stated— and, in view of Fritzberg's testimony, this is important—that he heard Fritzberg ask the mate whether the rope was all right; whether he (the mate) did not think it was "a bad wire." Fisher declared that the rope was "like shaved—splintered; * * * you could see the rope; there is a small rope inside of the wire runner; you could see that when it was splintered there is strands like breaking"; he said the splintered part was between the bucket and the upper block of the boom—"I think, as far as I can remember, between the bucket and gin block, I think; that is as far as I can remember it so long ago." He said he had seen Fritzberg "last Friday"—apparently the day when Fritzberg testified—and that Fritzberg had told him that the libelant's counsel wanted to see him, "so I came here to-day." Fritzberg had said nothing about his own testimony, and nobody had; Fritzberg had had no talk with him about the wire rope, and he himself had had no talk with anybody on that subject from the time of the accident up to the time of giving his testimony. He said that the condition of the wire—which he went into in some detail—was easy to be seen, so that anybody could have seen it, but said that he had not warned any of the men, because it was none of his business.

"But Fritzberg had mentioned it to the mate, and when he had mentioned it, it was none of my business. * * * Fritzberg had told the mate. I thought it was the mate's place to change the wire."

He also declared that this was the first time he had ever told anybody that Fritzberg had talked with the mate, repeating that he had never spoken with Fritzberg about it.

After Fisher had given the foregoing testimony, Fritzberg was recalled on April 20, and then testified for the first time, in contradiction of what he had said before, that he had had a conversation with the chief mate, and had spoken to him about the ropes, both at No. 1 and at No. 4 hatch, telling him "they looked pretty bad." He explained that he did not testify about this at his previous examination, because he had never been a witness before, and "He put too many questions to me, and I got excited and couldn't answer all of them." He went on to testify that the mate promised to see about it, and that a new wire had been put up at No. 4. Being asked what caused him to mention about the wire ropes, he replied:

"I do that of my own free will. If I see anything that don't fit very well, I tell them about it, and if I don't want it I go away; sometimes I am too busy, and I don't get a chance to tell about it."

On cross-examination he was asked whether anybody was near when he said this to the mate, and replied:

"No; I don't think so. There might have been; it is hard to tell, because it is too long; I can't remember."

He had not told his foreman (Shannon) that he thought the wire was not in proper condition to be used, and had told nobody except the mate; he thought the wire at No. 1 had been used a good deal, probably to unload two or three or four or five cargoes; when the hook (holding the tub) "was at the top of the hatch coamings," the worn place would be "about the top of the gin block"; his foreman could have seen what was the matter, but he was not there; he also denied that he had talked with Fisher on the subject.

The libelant offered no further evidence about the rope, but on May 14, 1912, Charles Shannon, the foreman in charge of the stevedores, was called for the respondent, and testified that the rope was the usual and proper kind and size for discharging such cargo; that it was always his custom to examine the ropes before they were used, so that he might see if they were in proper condition; and that he had examined this particular rope, and also those at the other hatches. If there had been anything the matter with them, he would not have permitted them to be used; and, later in his examination, it appeared that while this cargo was being discharged the rope at No. 3 was found to be "kind of furry," whereupon he complained at once and a new rope was immediately furnished. As to the rope at No. 1, he said distinctly that after an examination at 7 o'clock in the morning, before the discharging began, he could not find that there was anything the matter with it; he could see no flaws; it appeared all right to him; he heard no complaints about it from anybody; if he had heard any, he would have ordered a new one to be put in its place; it would have

been the hatch tender's duty to call his attention to any such defect; the hatch tender had called his attention to the unsafe condition of the wire at No. 3 hatch; his men were always instructed that if they saw anything like signs of wear in a rope to give notice of it at once; the tub could not have been overloaded, because it would not hold more than a ton.

This is a sufficient outline of the testimony, and we think its decided weight is in favor of the respondent. To accept the story of the two witnesses referred to requires us to attach no value to the testimony of the three officers, of the foreman, of the winchman, and of the hatch tender; and we are not prepared to take that step. The conflict here does not permit us to reconcile the testimony, but requires us to choose between the opposing witnesses. In such a situation minds will differ, and we find ourselves obliged to take a different view from that taken by the court below. Even on the assumption that the doctrine of res ipsa loquitur applies to the facts before us—and we intimate no opinion whatever on that subject—the respondent has satisfactorily sustained the burden imposed by that rule, and has proved affirmatively that he discharged every duty of care required to be taken. We find no sufficient proof of negligence, and we see no ground upon which a recovery of damages can be satisfactorily rested.

The decree is reversed, with costs in this court, and with instructions to dismiss the libel; each party to pay the costs of his own witnesses in the District Court.