THE AFRICA MARU.

THE LONDON MARU.

HABICHT BRAUN & CO. et al. v. OSAKA SHOSHEN KAISHA (two cases).

Nos. 58, 59.

Circuit Court of Appeals, Second Circuit. Nov. 16, 1931.

Single & Hill, of New York City (Robert E. Hill and Douglas D. Crystal, both of New York City, of counsel), for appellants.

Hunt, Hill & Betts, of New York City (George C. Sprague, of New York City, of counsel), for appellee Osaka Shoshen Kaisha.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

Appellants' libels were filed to recover for cargo damage to two shipments, aggregating 2,800 cases of walnut meats, shipped in January, 1927, from Tientsin, China, to New York City. The first libel is for damage to 800 cases which were loaded on the appellee's vessels Chosa Maru and Kanan Maru. These cases were transshipped to the Africa Maru at Kobe. An open lighter was used during a fall of rain and snow, and the boxes, it is claimed, were wetted. The second libel is for damage to 2,000 cases shipped from Tientsin in the same month on the steamships Chosa Maru, Kanan Maru, and Busho Maru, and also transhipped in open lighters at Kobe to the steamship London Maru during a fall of rain and snow. When the walnuts arrived at Seattle, they were found in a moldy and damaged condition. They were discharged there, to be reconditioned and sold to avoid further loss. The cases containing the walnut meats, which were discharged, were found to show clear signs of having been wetted. The external marks were blurred and smeared, and the metal strips around the cases were rusted. Tests made show wetting was due to fresh, and not salt, water.

In the Africa Maru shipment, there is a claim of supporting evidence of sweat in the hold from which the walnut meats were discharged. But the testimony satisfactorily establishes that the 800 cases contained in this shipment were damp external-

ly; that the ink markings had run, the bands were rusted, and the mold was apparently on the outside of the cases. If there had been sufficient sweat in this hold of the vessel to cause these manifestations of wetting, it is clear that similar signs would have been present on some 575 other cases of walnut meats which were in the same hold. It is unlikely that sweat would have collected in one portion of the hold, and of such magnitude as to cause the damage herein referred to, and not subject the other cases to the same sweat and damage. Moreover, it appears that other commodities consisting of cotton rags and peas which were not damaged by mold were in the same hold, while all of the 800 cases of walnuts had to be reconditioned.

There was no claim of sweat in the hold of the London Maru where its cargo was placed and found damaged. It was also established that other cases of walnuts shipped in the same hold came through undamaged.

In the damaged cases, the mold in all instances was confined to a layer of from one-half to an inch or two inches thick along the side, bottom, or ends of the cases in juxtaposition to the side of the case showing indication of wetting. Where the layer of mold was cut or scraped off, the nuts on the inside were sweet and clean. This would tend to establish that the damage did not result from internal, but rather from external, causes. It is admitted that the walnuts were received in apparent good condition at Tientsin. The transshipment at Kobe is conceded, as is their damaged condition when delivered at Seattle.

■ The evidence was taken largely by deposition, and the trial judge did not have the advantage of seeing and hearing the witnesses. We therefore have examined the weight to be given to these depositions, viewing them in the light of an admiralty trial judge. The Santa Rita, 176 F. 890, 30 L. R. A. (N. S.) 1210 (C. C. A. 9); Horsley v. Modzelewski, 220 F. 241 (C. C. A. 3).

■ The bills of lading do not grant exceptions for mold damage. They do, however, contain the following exceptions:

"2. * * * perils of the sea * * *, and all and every other danger, accident of land, seas, rivers and/or navigation of whatsoever nature and kind always excepted.

"* * * The ship and/or carrier shall not be liable for the consequences of * * * rain; * * * snow; frost; climatic effects; * * * decay; * * * injury caused by * * * heating, * * * breakage; * * * insufficient packing; * * * sweat. * * *"

"7. * * * all perishable goods, * * * are taken solely at the risk of the shipper, consignee and/or owner of the goods."

The burden was on the appellee to establish that the damage sustained was due to a cause excepted in the bill of lading. The Folmina, 212 U. S. 354, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748; Liverpool Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 S. Ct. 469, 32 L. Ed. 788. And where the goods, admitted to have been received in apparent good condition, were delivered damaged after the voyage, the burden is on the carrier to show that it was occasioned by one of the perils or causes for which it was not responsible. Clark v. Barnwell, 12 How. 272, 13 L. Ed. 985; Stiles v. Ocean S. S. Co., 34 F.(2d) 627 (C. C. A. 2); Compania Naviera Mexicana v. Sporl (C. C. A. 5) 11 F.(2d) 777.

■ The mold was found not to have existed throughout the cases, and the nuts in the center of the boxes were in good condition. This, we think, establishes that the mold was not due to an inherent vice in the nuts. If due to a defect or vice in the nuts, mold and consequent damage would have been found throughout the cases. Instead the mold was confined either to the top, bottom, or the end, but never mixed throughout the case. Moreover, an expert witness competent to speak states that this mold, which was found, did not result from sweating or heat, nor from an inherent vice. There is also proof that mold would result from water, wetting from external source, which came in contact with the cases under favorable conditions for mold growth. Nor do we find persuasive proof or argument for the claim that the damage was caused by an inherent vice. It is said that the season in which these nuts were grown was a rainy one, but no proof establishes that other nuts suffered from mold either in shipment or at home.

Under somewhat similar circumstances, the Kings Bench Division in England, in R. & W. Paul, Ltd., v. Northumbrian Shipping Co., 40 Lloyd's L. L. 357, held a carrier liable for cargo damage. There a shipment of maize was placed in a deep tank which was separated into port and starboard compartments by a bulkhead running fore and aft. When the maize was unloaded on the port

side, it was found to be in good condition. On the starboard side it was in good condition until the last seven feet, which meant about 100 tons, which was all bad. At this point there was a substantial crust marking the beginning of the place where the maize had been damaged by wetting of some sort. The libelant contended that the maize was damaged by sea water, although no evidence was produced as to how the water got in there. The ship was tight; there were no defects in any pipes that passed through the plates, nor in the plates or bulkheads. There was no trace of any leak into the deep tank. The ship contended that a proper inference was that the damage was due to moisture in the maize itself. The court found that the season in which the maize was grown was wet, damp, and muggy, and that at the time of shipment and succeeding days the weather was damp and humidity very high, all favorable to the development of harmful moisture in the grain. But the court, pointing out that the damage was congregated in one portion and not scattered throughout, held that the moisture content of the maize itself was not responsible for the damage and refused to excuse the carrier from liability on the theory that it was caused by an inherent vice. The court said:

"Now, when one comes to realize that the whole of one side was good, and that all of it was good on the other side except the bottom 100 tons, it is almost impossible for the ordinary mind to escape the conclusion that the cause of the trouble in the part which was bad was something which happened to it from below, after it all was loaded, because to imagine that a defect in the grain itself, which must have been unevenly distributed in any view because only 100 tons out of 300 tons went bad, might by the merest chance have so sorted itself out in the process of this indistinguished loading so that all the bad, or all that was possibly contaminable by bad, should have got to the bottom of it, and all that was good or beyond the reach of contamination should have got to the other side, so that there was none bad there—it is not as if there was some bad on one side here and there—is the most difficult thing; it is the most difficult thing for the ordinary man to conceive; and therefore one is almost driven, apart from something very startling, to come to the conclusion that whatever happened, whatever the cause of the disaster was, it was something that happened after the maize was loaded."

Nor is there merit in the suggestion that the cases were insufficient. The containers used were the usual and customary boxes. The appellee's witnesses testified that they were of the same type as all other shipments. They were in good condition.

The weather record shows rain and snow during the days of transshipment. Appellee submits depositions denying the fact that cargoes were unloaded during rain or snowy weather. But it would seem that there was no other occasion for the cases to have become wet, with the result above mentioned. However, the storage of wet or even damp cases in the humid atmosphere of a ship's hold on a winter voyage, where ventilation is restricted, would produce conditions favorable to mold growth. Exceptions to damage or loss by rain, frost, or snow, in the bills of lading, will not, under the circumstances, excuse for the neglect in transshipment to use reasonable care in keeping the cases dry. On this record it is clear to us that the appellee has not sustained its burden, under the circumstances, of showing that the mold found at Seattle was not due to its fault.

The decrees are reversed.