ELIA SALZMAN TOBACCO CO., Ltd.,
Tobacco Insurance Co., Ltd., Tobacco
Development Co. of Africa (Pty.) Ltd.,
and The Standard Commercial Tobacco
Co., Inc., Libellants-Appellees,

v.

The SS MORMACWIND, her engines,
boilers, etc.,
and
Moore-McCormack Lines, Inc.,
Respondent-Appellant.

No. 251, Docket 30700.

United States Court of Appeals
Second Circuit.

Argued Dec. 8, 1966.

Decided Jan. 20, 1967.

**538**

William Warner, New York City (Symmers, Fish & Warner, New York City, on the brief), for libellants-appellees.

Herbert M. Lord, New York City (John S. Rogers, Burlingham Underwood Barron Wright & White, New York City, on the brief), for respondent-appellant.

Before LUMBARD, Chief Judge, and HAYS and FEINBERG, Circuit Judges.

LUMBARD, Chief Judge:

The respondent, Moore-McCormack Lines, Inc., appeals from a decision of Judge Croake in the Southern District of New York holding it liable to the libellant Standard Commercial Tobacco Co., Inc. (Standard) under the Carriage of Goods by Sea Act, 49 Stat. 1207 (1936), 46 U.S.C. §§ 1300, 1303, 1304, for mold damage sustained by a shipment of 1,729 bales of Turkish-type Rhodesian tobacco carried aboard the S.S. Mormacwind from Beira, Mozambique, to Newport News, Virginia, during the spring of 1960.

 Judge Croake found that the mold resulted solely from appellant's negligent placement of green or wet dunnage (strips of wood one inch by four to eight inches by ten to twelve feet) between horizontal tiers of bales, and from its negligent ventilation of the compartments containing the bales during periods of fog and rain. Appellant attacks these findings as clearly erroneous, and urges this Court to reweigh the evidence before Judge Croake, which except for the testimony of appellant's expert, Dr. Purdy, consisted entirely of documents and depositions. Cf., e.g., M. W. Zack Metal Co. v. S.S. Birmingham City, 311 F.2d 334 (2 Cir. 1962), cert. denied, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963); Pfeifer Oil Transp. Co., Inc. v. The Ira S. Bushey, 129 F.2d 606 (2 Cir. 1942). On this record, we see no reason to disturb Judge Croake's findings.

When discharged and opened at Newport News, numerous bales proved to contain mold along the impressions of the dunnage and penetrating for as much as two inches. The bales were otherwise free of mold except for some traces of hair mold, and although moister than usual showed no signs of heating. The dunnage had been placed at right angles across the tiers of bales, with two strips resting on each bale. The report of the surveyor for libellant Tobacco Insurance Co., Ltd. noted that "numerous bales adjoining each other and in contact with the same two strips of dunnage were found moulded in way of one strip and not in way of the other." The accounts of the other surveyors, although less detailed, attested to the same pattern. Judge Croake concluded, as appellees' witnesses testified and Lloyd's Survey Handbook states,[1] that these facts indicate that the mold was caused by over-moist dunnage and too humid ventilation, and not by any excess moisture present in the bales when shipped.

Appellant notes that the bills of lading show only the apparent external good condition of the bales when shipped at Beira, and points to evidence that the bales were still drying when shipped and that a Lloyd's surveyor at Beira found two bales damaged by fresh water. It urges upon us the alternative theory of its expert, Dr. Purdy, that excess moisture already present in the bales was squeezed to the surface along the strips of dunnage by the pressure of overlying bales. Appellant accounts for the pattern

---

1. "The main source of damage to tobacco leaf in transit is moisture, either by contact with water or through being packed with an exceptionally high percentage of moisture. When packed containing excess moisture the leaf will turn mouldy, ferment and become 'off' in flavour; these conditions will be more noticeable and severe towards the centre of the pack, whereas signs of mould and discolorations on the outer edges of the pack will rather indicate contact with water or excess moisture from external causes." Lloyd's Survey Handbook 188 (rev. ed. 1956).

of mold along some strips, but not others, by the fact that the bales were tiered brickwise, so that any bale below the top tier had two bales directly above it, of possibly different moisture content.

Appellant's theory fails to persuade us that Judge Croake's findings were wrong, especially as Dr. Purdy lacked the long experience of appellees' witnesses with the shipment of tobacco by sea. We are particularly persuaded, as was Judge Croake, by the uniform degree of molding of the bales along each strip of dunnage, which we feel appellant's theory fails to explain. Cf. The Africa Maru, 54 F.2d 265 (2 Cir.1931), cert. denied sub nom. Osaka Shosen Kaisha v. Habicht Braun & Co., 285 U.S. 556, 52 S.Ct. 457, 76 L.Ed. 945 (1932).

Appellant also assails Judge Croake's finding, contrary to the testimony of the Mormacwind's then chief officer, that the bales were ventilated during fog and rain. The ship's log, however, records forced ventilation of the compartments in which the bales were carried on three occasions when "fog," "intermittent squalls," and a "light drizzle" were logged.

Appellant next contends that Judge Croake's finding that the mold was not caused by any inherent vice of the tobacco must be overturned because appellees introduced no direct evidence that the tobacco was in good condition when shipped. This Court has held, following its decision in The Niel Maersk, 91 F.2d 932 (2 Cir.), cert. denied sub nom. Bradley v. The Niel Maersk, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582 (1937), that when cargo damage may have resulted from a hidden defect present at the time of shipment, the shipper has the burden of proving that the cargo was in good condition when delivered to the carrier, because the shipper has access to the facts concerning the cargo's then condition. Commodity Serv. Corp. v. Hamburg-American Line, 354 F.2d 234 (2 Cir. 1965); Hecht, Levis & Kahn, Inc. v. The S.S. President Buchanan, 236 F.2d 627 (2 Cir. 1956); American Tobacco Co. v. The Katingo Hadjipatera, 81 F.Supp. 438, 446-447 (S.D.N.Y.1948), modified on other grounds, 194 F.2d 449 (2 Cir. 1951), cert. denied sub nom. American Tobacco Co. v. Hadjipateras, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952).

However, this burden does not mean that the shipper must always introduce direct evidence that the cargo was in good condition when shipped. The shipper may also meet his burden by showing, from the condition of the cargo as delivered or otherwise, that the damage was caused by the carrier's negligence and not by any inherent vice of the cargo. Philippine Sugar Centrals Agency v. Kokusai Kisen Kabushiki Kaisha, 106 F.2d 32 (2 Cir. 1939); Warner Barnes & Co., Ltd. v. Kokosai Kisen Kabushiki Kaisha, 102 F.2d 450, modified on another point, 103 F.2d 430 (2 Cir. 1939). In light of Judge Croake's findings, which we affirm, appellees have made such a showing here.[2]

Appellant's final contention is that the judgment should be reversed because Standard did not prove that it sustained any loss from the mold damage to the tobacco. The tobacco was shipped by the libellant Tobacco Development Co. of Africa (Pvt) Ltd. (Tobacco Development), which the record suggests was either a subsidiary of the libellant Elia Salzman Tobacco Co., Ltd. (Salzman) or jointly owned by Standard and Salzman. In any event, Standard's assistant treasurer testified that Standard, Salzman, and Tobacco Development "are all part of a single operation."

Invoices in the record indicate that the tobacco was sold C. I. F. by Tobacco

---

**2.** Appellees also contend that, even if the shipper fails to prove that the cargo was in good condition when shipped, the carrier has the ultimate burden of establishing that the damage was caused by an inherent defect, as the district court held in American Tobacco Co. v. Goulandris, 173 F.Supp. 140, 175 (S.D.N.Y.1959), aff'd on other points, 281 F.2d 179 (2 Cir. 1960). Since we hold that the appellees did prove, by circumstantial evidence, that the tobacco was in good condition when shipped, we need not decide whether this holding, which was not considered by this Court on the appeal in *Goulandris*, is the rule in this circuit.

Development to Standard, so that the risk of loss during shipment was on Standard, Gilmore & Black, Admiralty § 3–8 (1957), and Judge Croake found that Standard "owned the cargo at the time the damage was sustained." However, after the tobacco arrived at Newport News and all the parties, including appellant, agreed that the tobacco had depreciated five per cent in value, Standard reduced its invoice price to the ultimate purchasers by five per cent (resulting in the stipulated damages of $5,061.55), but also remitted five per cent less than the agreed price to Salzman as "Agents for" Tobacco Development. So far as the record shows, Standard has not been pressed to remit more.[3]

 Appellant argues that since Standard has not shown that it bore the loss, its recovery is barred by section 4(5) of the Carriage of Goods by Sea Act, 49 Stat. 1211 (1936), 46 U.S.C. § 1304(5), which after specifying permissible contractual limitations on the carrier's liability provides: "In no event shall the carrier be liable for more than the amount of damage actually sustained." We think it clear that "the amount of damage actually sustained" refers to the actual reduction in the value of the cargo, and that section 4(5) was not intended to alter the long-established rule that an owner or consignee may recover for damage to cargo, and that, being protected against double recovery, the carrier has no concern with any equities between the owner or consignee and others. E.g., The Nichiyo Maru, 89 F.2d 539 (4 Cir. 1937); cf., e.g., The W. C. Block, 71 F.2d 682 (2 Cir.), cert. denied sub nom. Cornell Steamboat Co. v. Scholl, 293 U.S. 579, 55 S.Ct. 91, 79 L.Ed. 676 (1934); 1 Carver,

Carriage by Sea par. 96 (11 ed. Colinvaux 1963). In this case, all the other conceivable claimants to the damages, Salzman, Tobacco Development, and the insurer, Tobacco Insurance Co., Ltd., were also libellants, and their libels have been dismissed. Appellant is thus protected against any possible double recovery.[4]

Affirmed.

---

3. The record suggests at least one possible explanation. The libel alleges that Tobacco Insurance Co., Ltd. paid the damage, and Standard's assistant treasurer stated that "we assumed that the insurance was filed with our people in London," apparently referring to Salzman; this suggests that the insurance proceeds may have been paid directly to Salzman.

4. The Mormacmar, 75 F.Supp. 520 (S.D. N.Y.1947), L. W. & P. Armstrong, Inc.

v. The Mormacmar, 93 F.Supp. 930 (S.D. N.Y.1950), aff'd, 196 F.2d 752 (2 Cir. 1952), in which the shipper's claim that the carrier negligently failed to insure the cargo was dismissed because the shipper had made a final settlement for the full damage with its own insurer, cannot aid appellant, because nothing in the record indicates that Standard has been released from any claims of the other libellants.