Milton Shalleck, J.
After I had denied defendant’s motion to suppress the evidence in this case1,[1] asked his counsel whether he wished to proceed to trial before a single Judge or a panel of three Judges.[2] His answer was in effect: “ Neither. Defendant demands, and moves, that he be tried by a jury, as permitted under the recent Duncan case [Duncan v. Louisiana, 391 U. S. 145] in the United States Supreme Court ”. What I now must decide is, shall there by a jury trial here, in view of the explicit statutory fiat that “ All trials in the court shall be without a jury ”.[2]
Defendant has been charged with criminal (knowing and unlawful) possession of a dangerous drug in the fourth degree.[3] The Legislature has assessed that kind of act as the highest type of crime below a felony — a class A misdemeanor. Upon a class A conviction a defendant may be imprisoned for one year[4] and may be subjected to pay a fine of $1,000.[5]
If the defendant had been accused of having committed the same unlawful act elsewhere in this State than the City of New York, the granting of his demand and motion for a trial by jury would, be impelled (Code Crim. Pro., § 702.)[6] But to this very day no Special Sessions court has granted a jury trial of a misdemeanor within the City of New York.[7]
*962 There is an unbroken consistency to these holdings.[8] And although the defendant in People v. Kaminsky (208 N. Y. 389) (the leading case) argued that he had “ been deprived of his liberty without due process of law and denied the equal protection of the law, contrary to section 1 of the 14th amendment of the United States Constitution ”[9], the court, stating (p 394) that ‘ ‘ the character of the offense is determined by the nature of the punishment rather than by its supposed moral turpitude ”, held that there was no deprivation “ of the constitutional right of trial by jury”. The New York Constitution, it said, ‘ ‘ expressly provides that Courts of Special Sessions shall have such jurisdiction of offenses of the grade of misdemeanors as shall be prescribed by law” (p. 394). This has meant, traditionally, trials without juries. (See, also, People v. Harding, 115 Misc. 298, 301.)[10]
Five years after Kaminsky (supra), this Department reviewed the long-continuing limited jurisdiction of the Court of Special Sessions[11], pointing out the intrastate legislative discrimination from its beginning in 1744 and concluding: “ This historical review of the legislation affecting Courts of Special Sessions demonstrates that from their first establishment to this day such courts in the city and county of New York differed from those held in other counties in the persons designated to hold the court, in jurisdiction of offenses and in power to sentence *963 on conviction; that laws specially applicable to each have been enacted, but never has the jurisdiction to hear, determine and pronounce judgment of either been limited or controlled by reference to the laws applicable to the other.” (People ex rel. Dembinsky v. Fox, 182 App. Div. 642, 648 [1918].)
That has been, and is currently, the New York courts’ persistent legal view of a defendant’s jury trial rights, constitutionally, in a Special Sessions court. As recently as July 29, 1968 a Kings County Supreme Court Justice stated: “ Kaminsky has never been overruled and, indeed, has never been questioned until the very recent decision in Duncan ” (People v. Morganbesser, 57 Misc 2d 678, 679; same case, N. Y. L. J., Aug. 20, 1968, p. 11, col. 8).[12]
These are days for questioning, however. Advances in legal concept follow from changing approaches to the social values — the mores — of the people. The law, fortunately, is able to attune itself appropriately to the socio-economic needs, the goals and horizons of the people as they currently change. Flexible standards are desirable — indeed eminently required — in matters involving the conduct of humans, in which area rigid mechanical rules must bend to the varied needs of human lives and freedoms.
As Judge Cabdozo said in his Yale lecture series “ The Growth of the Law ’ ’, specifically in ‘ ‘ The Function and the Ends of Law”: “The apportionment of relative value of certainty on one side and justice on the other, of adherence to logic and advancement of utility, involves an appraisement of the social interest which each is capable of promoting. That is a calculus which has not yet been definitively made by any master of juristic theory ” (p. 83). And further, stated Judge Cabdozo, quoting from Justice Stone’s writings when the latter was Dean at Columbia: “ ‘the choice of the particular device determining the result — social utility — the mores of the times, objectively *964 determined, may properly turn the scale in favor of the one against the other.’ If classification were ever to become complete for any time and place, there is little chance that it could be final. The good of one generation is not always the good of a successor[13]. * * * In the present state of our knowledge, the estimate of comparative value of one social interest and another, when they come, two or more of them, into collision, will be shaped for the judge, as it is for the legislator, in accordance with an act of judgment in which many elements cooperate. It will be shaped by his experience of life; his understanding of prevailing canons of justice and morality; his study of the social sciences; at times, in the end, by his intuitions, his guesses, even his ignorance or prejudice.” (pp. 85-87.)
All of this, of course, must be circumscribed by the restrictions which are placed upon him by his oath of impartiality in the application of law. He cannot pervert a statute because he disagrees with it. He cannot be knowingly subjective in appraisals of legislative values. He must accustom his own ideas to the thought and will of the community as reflected by its highest judicial and legislative segments.
For rigidity in the application of legal principles, as an end in itself, is intolerable in a changing world. The closed eyes of the figure of Justice should not be mistaken for blindness —'the inability to see what is happening around her. Instead, the blindfold should symbolically evince an inner sight — to change the balance of her scales as community problems demand that different weight be given to newly arising questions. To be effective the interpretation and application of the law must be elastic and viable. New approaches to rights and duties should always govern judicial decision.
And so we arrive at Duncan v. Louisiana (391 U. S. 145, supra). No one in Louisiana at that time could have had a jury trial unless the punishment, on conviction, was “ at hard labor ’ ’. Duncan was charged with simple battery which is a misdemeanor punishable by two years’ imprisonment and a $300 fine. He sought a jury trial. His application was denied. He was convicted and sentenced to serve 60 days and pay a fine of $150. Appeals followed.
‘ ‘ The question ’ ’, the Supreme Court said, 11 is whether a crime carrying such a penalty is an offense which Louisiana may insist on trying without a jury.” And it answered the question *965 unequivocally: “We think not ” (p. 160). The reasoning behind this conclusion is two-fold:
1: “ Because we believe that trial by jury in criminal cases is fundamental to the American scheme of justice, we hold that the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which — were they to be tried in a federal court — -would come within the Sixth Amendment’s guarantee. Since we consider the appeal before us to be such a case, we hold that the Constitution was violated when appellant’s demand for a jury trial was refused ’ ’ (pp. 149-150) ,[14]
2: “ Crimes carrying possible penalties up to six months do not require a jury trial if they otherwise qualify as petty offenses, Cheff v. Schnackenberg, 384 U. S. 373 (1966). But the penalty authorized for a particular crime is of major relevance in determining whether it is serious or not and may in itself, if severe enough, subject the trial to the mandates of the- Sixth Amendment. District of Columbia v. Clawans, 300 U. S. 617 (1937). The penalty authorized by the law of the locality may be taken 1 as a guage of its social and ethical judgments,’ 300 U. S., at 628, of the crime in question.” (pp. 159-160).
The two elements, then, must coincide to dictate a jury trial. One is always now present: that States are subject to the constitutional limitations of the Fourteenth and Sixth Amendments. The other is that the character of the crime must be “ serious ” enough to be within the ambit of those limitations. In the latter aspect, our highest court did not furnish precise guidelines. In fact it admitted (p. 160) that ‘ ‘ the boundaries of the petty offense category have always been ill-defined, if not ambulatory ”. It went on to throw the onus of original guesswork on those of us who labor on day-to-day on-the-spot pronouncements : “In the absence of an explicit constitutional provision, the definitional task necessarily falls on the courts, which must either pass upon the validity of legislative attempts to identify those petty offenses which are exempt from jury trial[15] or, where the legislature has not addressed itself to the problem, themselves face the question in the first instance. In either case it is necessary to draw a line in the spectrum of crime, separating petty from serious infractions. This process, *966 although essential, cannot be wholly satisfactory, for it requires attaching different consequences to events which, when they lie near the line, actually differ very little.” (pp. 160-161). And in that very case the court shied away from even an attempted definition by concluding: “ We need not, however, settle in this case the exact location of the line between petty offenses and serious crimes. It is sufficient for our purposes to hold that a crime punishable by two years in prison is, based on past and contemporary standards in this country, a serious crime and not a petty offense.” (pp. 161-162) It, therefore, reversed and held it was error to deny a jury trial to the defendant.[16]
That very day (May 20, 1968) the same court decided a second case bearing on this problem (Bloom v. Illinois, 391 U. S. 194). There the defendant was convicted of criminal contempt. He was sentenced to 24 months ’ imprisonment. Timely demand for a jury trial had been made and refused. The Illinois statute provided for no specific maximum time as punishment by imprisonment for contempt. The question, then, (within the purview of Duncan) was whether the Constitution ‘ ‘ also guarantees the right to jury trial for a criminal contempt punished by a two-year prison term” (p. 195).
In its discussion the court stated (pp. 197-198) that“ the issue whether a severe punishment would itself trigger the right to jury trial ” was left open by the prior cases which all agreed that “ Contempt did not ‘ of itself ’ warrant treatment as other than a petty offense * * * unless the punishment makes it a serious one.” Where the contempt is punishable by a prison term of only six months (Cheff v. Schnackenberg, 384 U. S. 373) it is a petty offense in which there is no constitutional right of trial by jury; “ but in our view, dispensing with the jury in trial of contempts subjected to severe punishment presents an unacceptable construction of the Constitution ” (p. 198). Thus, it held (p. 201), criminal contempt being “ a crime in the ordinary sense ’ ’, the 1 ‘ right to jury trial in state court prosecutions ’ ’ was guaranteed, when serious, ‘1 just as * * * for other crimes ”. (p. 200.) It, therefore, comes within “ the rule that petty crimes need not be tried to a jury ” (p. 210).
This case, then, reiterated the Duncan holding that a ceiling of two years’ imprisonment gave “ serious ” character to crime. It, therefore, guaranteed the constitutional right to a jury trial *967 to defendant both in Federal and State courts. Likewise, it established a floor of six months ’ punishment as being a ‘ ‘ petty ’ ’ and not a “ serious ” crime (Dyke v. Taylor Implement Mfg. Co., 391 U. S. 216 — the third relevant case decided the same day). But between that ceiling of two years and that floor of six months’ imprisonment the court expressed no view, since it had no ‘ ‘ occasion to state precisely where the line falls between punishments that can be considered ‘ petty ’ and those that cannot be ” (Dyke, p. 220).
We have to look elsewhere for guidance. And there is little of that anywhere. Five Justices in Dyke agreed in the opinion; the two Justices who dissented in Duncan and Bloom concurred in Dyke, but not on the point involved in this discussion; the two Justices who concurred in a separate opinion in Du/ncan and agreed fully in Bloom, dissented in Dyke, saying through Black, J: “I am loath to hold whippings or six months’ punishment as ‘ petty ’. And here, where the offense is punishable by a $50 fine and 10 days in jail behind bars, I feel the same way. Even though there be some offenses that are ‘ petty,’ I would not hold that this offense falls in that category.” (p. 223).[17]
But, since the majority agreed that the penalty authorized by the law of the locality reflects its ^social and ethical judgments, we can rely, as a “ gauge ’ ’, upon what the Legislature and the courts of New York have prescribed as degrees of culpability to particular unlawful acts. In this respect, Kaminsky (supra) agrees with Duncan (p. 159) .[17]
The Legislature here has made the punishment a year’s imprisonment for conviction of a class A misdemeanor. The nature of that punishment, it seems to me, is of sufficient severity to make the accusation one of a “ serious ” crime, thus invok *968 ing the requirements of the Sixth and Fourteenth Amendments. So that, under normal circumstances, and in theory and philosophy, the application and demand for a jury trial should he granted in this case.[18]
However, there are several other considerations which cause me to hesitate toward that end.[19]
In Dwncan the court remarked (n. 30, p. 158): “It seems very unlikely to us that our decision today will require widespread changes in state criminal processes ”, offering the gratuitous statement in Bloom that “ considerations of necessity and efficiency normally offered in defense of the established rule ” do not justify denials of jury trials in “ serious ” cases (pp. 198-199) and neither do “ considerations of * * * expedition, and low cost ” (p. 209 — the latter seemingly referring to criminal contempts only). The court no doubt had in mind that “ In 49 of the 50 States crimes subject to trial without a jury * * * are punishable by no more than one year in jail ” (p. 161; see, also, its n. 33). It was possible, therefore, that since most States are already equipped to deal with jury trials above such punishments as part of their ordinary handling of criminal trials, no “widespread changes ” will be necessary[20] and that the existing ‘ ‘ expedition, and low cost ’ ’ could easily otherwise be effected in the expansion and widening of its juridical requirements made necessary by its decision (if, of course, less than a year’s punishment amounts to a “ serious ’ ’ criminal act ; for the “ penalty authorized * * * is of major relevance ” [Duncan, p. 159]). It would apply to, say, Chenango, Schoharie, Herkimer, Cattaraugus, Chemung or Essex Counties right here in New York State, since misdemeanors, “ serious ” or “ petty ” under any appraisal, can there be tried by jury.
But what about the five counties in the City of New York? Did the court consider the effect of its decision on the people living there ? Did it realize the compelling necessity for differ- *969 satiating treatment of these eight million people from the rest of the State? Or was their consideration overlooked when it said that “ widespread changes ” “ seem unlikely ” by its decision? A concise discussion of the situation might not be amiss.
Prior to the admission of Alaska and Hawaii as States, New York City, because of its teeming population and complexity of life within its borders, was often referred to unofficially as the 49th State. And for good reason. The difficulty of governing it was so great — for its sheer numbers alone — it was said that being Mayor was the second most difficult job in the United States. To be a Judge in the New York City Criminal Court is also a challenge of the highest degree.
This court is the most overworked and understaffed court of any community. It handles the greatest volume of matters. The court is open and does business 365 days a year.[21] This includes Saturdays, Sundays and holidays. Nights, too — every one of them, seven a week, including those' weekends and holidays. Only 78 Judges[22] (when all are healthy enough- to work this rigorous schedule) handle hundreds of thousands of eases a year — from the most humble offenses (traffic infractions) to arraignments and preliminary hearings on the most heinous of felonies. It is a versatile court. It serves divers functions. Many leaders of the Bar have called it the most important court anywhere.[23] The day court hours are from 9:30 a.m. to 5:00 p.m. — a long day. For those of us whose health and sex permit sitting then, nighttime hours begin at 7:30 p.m. The Judge rarely finishes his work before one or two o’clock the following morning. No other Judge of a court of original jurisdiction spends more time in court. No higher administrative court can find hours in the day or night to increase these Judges’ burdens, either time-wise or workload-wise.
*970 This court is also short on nonjudieial personnel and plant. The few large courtrooms available to the Judges for calendar, arraignments and assignment of cases are invariably so crowded as not to be able to accommodate the hundreds of people— defendants, their lawyers, the police, the assistant district attorneys, legal aid lawyers, Vera Foundation representatives, Correction Department officers, Probation Office personnel, bondsmen, witnesses, etc. Calendars of 200 cases for arraignments are the normal order of the day; over 100 cases for other parts each day. To keep decorum in the courtrooms is a job in itself; for there is a plethora of human beings and a dearth of court officers there. And what of the other working courtrooms— the trials, the motions, and hearings? Well, they have been carved out of clerks’ rooms, filing rooms — yes, and out of what were meant to be Judges’ robing rooms.[24] They are so small that no public can be seated at the “ public ” trials now there held. If jury trials were permitted in “ serious ” misdemeanor cases, no jury, regardless of size, could be physically accommodated in these rooms. They were created in stopgap emergency because of the volume of business in the court and to satisfy the public need for a “ speedy trial ” as envisioned constitutionally.
Judges labor under additional handicaps. There is presently no privacy to work on their legal matters. They must share chambers, with consequent loss of quiet contemplation for decision and opinion, which they should not have to share with another Judge. There are no legal secretaries to do the spade work for the Judges’ tools of trade — decisions.[25] There is no corps of stenographers to whom a Judge can dictate his decisions. Contemplate, then, what would happen — what chaos would ensue — if charges to juries were to be prepared!
And where would the juries come from? Where would they be housed? If some legal method could be devised to put these juries under the jurisdiction of, and into the courtrooms assigned to, the Supreme Court, the regular work there would be impeded. For the volume of “ serious ” misdemeanors would soon take *971 over all the facilities of that court — and even more would be needed. What, too, would happen to the court calendars? If jury trials were the regular proceeding in “ serious ” misdemeanors, what would be the fate of those defendants who, because of poor risk, could not be placed on parole or who could not make reasonable bail set by the court? Are they to languish in jail while jury trials go on their merry way — one-a-day, perhaps, in each trial courtroom? This is a vitamin which is hardly therapeutic.[25]-A
The backlog of cases now — without juries — is getting worse. Other brakes have stopped “ expedition and low cost ” (viz: Gideon v. Wainwright, 372 U. S. 335[26], People v. Czajowski, 20 N Y 2d 608[27]); but these were absorbed just as I suggested (supra) that the Duncan and Bloom decisions could work outside of New York City. But now we are contemplating not “ unlikely * * * widespread changes ” but likely widespread changes — an upheaval. Presently there are no facilities or methods for obtaining and placing jurors. Are we to build a new courthouse to accommodate all these new jurors and places for trials? Are we to triple the number of Judges? Are we to increase personnel all around so as to preserve at least the semblance of constitutionally expeditious trials? We can theorize thqt cost is no objection in this sphere, but who can afford to foot such bills in New York City? And even if money can be found, how soon can such a new system be made to work? What happens in the meantime? Nor are these questions propounded as an excuse only. They are not merely ‘ ‘ administrative ” matters with which a Judge is unconcerned. Some of these questions comprise the heart-beat of so voluminous and vital a court as this, with the consequent adverse effects upon defendants’ rights.
I, personally and as a Judge, am wedded to the idea of jury trials both as a matter of principle and philosophy — for reasons not unlike those expressed in Du/ncan (pp. 151-158). As a Judge I enjoy the luxury of presiding over a trial by jury when I am lucky enough to be assigned to those parts. But will such trials in this court ensure proper and fair response ? I wonder *972 if the phrase 11 equal protection of the law ” is a glorified, nice-sounding pronouncement only, or is it meant to be a useful and effective tool to give fairness to all. Does it mean that the entire rubric of a State’s laws shall blindly cover all people within its borders, although the practical application of such laws, would work unfairly to many; or does it mean that a State’s laws, regardless of name, form, procedure or method, must give equal protection to all of its inhabitants so that all are treated with the same fairness?
If the overwhelming task of providing jury trials in all “ serious ” misdemeanor cases is consummated, resulting in a remanded defendant having to wait in jail for a trial in this court for months, he is not being equally protected by the same laws which provide a quick trial for the remanded defendant in Franklin or Yates county. However, under the present section 40 of the New York City Criminal Court Act, his trial by a 3-Judge bench puts him on the same footing, timewise. And, I daresay, from a point of view of fairness, as well.[28]
This, it seems to me, makes practical for such defendant the equality by which he should constitutionally be protected. If his only alternative, under a jury trial system in this court, is to be penalized by waiting in jail for his turn for a jury trial or waiving a jury trial to be reached for trial sooner, the defendant is faced with a Hobson’s choice. It is unfair. It is a denied justice. It does not equally protect. Even in Duncan, the court recognized that a jury trial ‘ ‘ is not necessarily fundamental to fairness in every criminal system ” (p. 150, n. 14). And the dissent believed that Palko v. Connecticut (302 U. S. 319) held that 111 due process of law ’ requires only that criminal trials be fundamentally fair” (p. 186); and, continues the dissent (p. 193), a jury trial “ is a good means, but it is not the only fair means, and it is not demonstrably better than the alternatives States might devise ”.
By forcing this case before me — a “ serious ’ ’ misdemeanor — to trial by jury would not, in my opinion, be the means of assuring to all that fairness, due process and equal protection will have been accomplished. It is that which motivates my constrained conclusion.[29] As Justice Charles Evans Hughes said to the New York State Bar Association in 1919: “ after all *973 it is the courts of minor jurisdiction which count the most so far as respect for the institutions of justice are concerned ”.[30]
It is also, in accord with our Administrative-Judge’s memorandum of May 28, 1968 delaying provision for a changed trial procedure until appeal process has been exhausted or legislative action has been taken. An appeal can settle the question so clearly set out here.
Motion and demand for a jury trial are denied. Defense counsel shall advise the court of the convenient date for trial at Part 2A (single Judge) or Part 2B (3-Judge panel).[31]

. Part IB1 has been designated by this court’s administration in which hearings (Code Crim. Pro., § 190 et seq.) and motions (viz: Code Crim. Pro., §§ 813-c to 813-i) are heard for those defendants at liberty on bail or parole.

. N. Y. City Crim. Ct. Act, § 40.

. Penal Law, § 220.05.

. Penal Law, § 70.15, subd. 1.

. Penal Law, § 80.05, subd. 1.

. “Before the court hears any testimony upon the trial, the defendant may demand a trial by jury.”

. At least so far as I have been able to discover from my research. [The first sentence of this footnote and the sentence in the text to which it pertains were written long prior to Sept. 10, 1968, the date on which the front page of the New York Times carried an article that a colleague who shares my chambers had granted an application for a jury trial.]

. Cobb’s commentary and annotative notes on this portion of the “Inferior Criminal Courts Act of the City of New York” (1925 ed., p. 45): “A jury trial in special sessions cannot be had under any circumstances. It is expressly withheld. (Cp. sec. 1578, Consol. Act, repealed, to same effect.) The right of trial by jury as conferred by the United States Constitution ‘ in all criminal prosecutions ’ (Amendment VI) has been held not to extend to the states. Bishop, New Crim. Pro. 2nd. ed., sec. 891; Maxwell v. Dow, 176 U. S., 581; Schick v. U. S., 195 U. S., 65; Jordon v. Mass., 225 U. S. 167. By sec. 2, Art. I of the State Constitution, ‘ the trial by jury in all eases in which it has been heretofore used shall remain inviolate forever. . . .’ Trial of misdemeanors without a jury antedated this guaranty. People v. Cosmo, 205 N. Y., 91; Duffy v. People, 6 Hill, 75; People ex rel. Ecklin v. Clark, 23 Hun, 374. Hence it has been repeatedly held not to extend to misdemeanors. See see. 16, Art. I of the State Const.; People ex rel. Cosgriff v. Craig, 195 N. Y., 190; People ex rel. Comerford v. Dutcher, 83 N. Y., 243; People v. Scherno, 140 App. Div., 95, 100; People ex rel. Murray v. Justices, 74 N. Y., 406; Murphy v. People, 2 Cowen, 815; People v. Kaminsky, 208 N. Y., 389 (in relation to children’s court); People ex rel. Borowiack v. Hunt, 157 App. Div., 848; 143 N. Y. Supp., 233. Even though the crime is infamous a jury is not a matter of right in a misdemeanor case. People v. Manett, 154 App. Div., 540; 139 N. Y. Supp., 614”.

. Points of Counsel, as summarized by the Reporter, p. 390.

. “all the cases hold that the right to a jury trial before a magistrate is statutory and not constitutional ”.

. Made part of this court in 1962 (N. Y. City Crim. Ct. Act, § 20.)

. I have wondered about it ever since I have been on the bench; but I have never had a matter before me to allow me to record such questioning. Why á misdmeanor commenced in Queens County and continuing in Nassau County and back to Queens County should result in different kinds of trial if the accused be apprehended on the way in Nassau or at its conclusion in Queens, is puzzling. Depending upon the place of trial for the same crime, defendant could demand a jury in Nassau but could at best demand only a three-Judge tribunal in Queens — perhaps only a few feet away. Was this the protected method adopted by this State against the constitutional caveat (U. S. Const., 14th Arndt.) that it could not “within its jurisdiction” deny to any person the equal protection of its laws, and “the right to a speedy and public trial, by an impartial jury” (U. S. Const., 6th Amdt.) ? Of course until the recent attack on their nonapplieability, these provisions had been held not to bind the States. (See n. 8, supra.) But see discussion infra, pp. 971, 972.

. See n. 30 in, Duncan (supra): “ our decisions interpreting the Sixth Amendment are always subject to reconsideration, a fact amply demonstrated by the instant decision” (p. 158)

. On pages 149-150 (n. 14) the court stated that a jury trial “is not necessarily fundamental to fairness in every criminal system that might be imagined but is fundamental in the context of the criminal processes maintained by the American States” and that “the structure and style of the criminal procesé [in every state] * 0 * have developed in connection with and in reliance upon jury trial.”

. See U. S. Code, tit. 18, § 1 — Petty offenses are there defined as punishable by a maximum of 6 months’ imprisonment and a $500 fine.

. Justice Harlan- (with whom Justice Stewart joined) entered a vigorous dissent on the constitutional aspect, claiming that the States would be put in a “ straightjaeket ” in their own development of their administration of criminal law. (391 U. S. 176) Justice Black, with Justice Douglas concurring, chided him for it.

. There are several facets to this problem. To a recidivist who has spent half of a 40-year life in prison, a two-year jail term is hardly “serious”. To a person whose life has been unblemished prior to conviction, and whose life will again be forever cleansed thereafter from this one misdeed, a five-day jail sentence is most “serious”. But when the court speaks of the “serious” nature of the crime, it is from the aspect of general public effect — how that crime hurts the community. And in that respect “the punishment fits the crime", according to its Legislative reacting by laws to the people’s wishes. The problem does not lend itself to easy solution.

a. “ As a general rule, the grade of the offense is determined by the nature of the punishment prescribed”. “The maximum punishment to which [one] is liable to be subjected is the test by which the degree of the crime must be determined.” “It is not confined to cases in which [one] must be so punished.” (People v. Lyon, 99 N. Y. 210, 216-217, 223-224; People v. Hughes, 137 N. Y. 29, 34.) The degree of crime is measured by the “power of imprisonment ”, “ not by the leniency of the sentencing tribunal.” (People ex rel. Seagrist v. Mederer, 33 N. Y. S. 2d 114, 117; cf. People v. Bellinger, 269 N. Y. 265, 269.)

. All prior eases holding otherwise — 'that no jury trial was available for misdemeanor, regardless — 'may have been correct, but not for the reasons ascribed by the court.

. I would suggest, with deference, that a “pioneering” jurist who would allow jury trials in the now-labelled “ serious ” crime misdemeanors in New York City without adequate discussion of those considerations would be acting, if not hastily, then cavalierly and patronizingly. Such perfunctory approach is hardly to be condoned. To colloquialize Alexander Pope, this is a place where angels should at least hesitate to tread.

. Perhaps the court had in mind that, on another test, it would hold a year’s imprisonment not to be “serious”; or it may be anticipating Legislatures’ lowering punishments from 1 year to 6 months to overcome the negativing of “ Considerations of necessity and efficiency ”; but this will not help the administration of justice.

. Except every 4 years, when it does business 366 days a year.

. Hopefully there will be 20 more in 1969 (L. 1968, ch. 987). But this is not at all a panacea. Volume of work in the court is increasing so rapidly that these Judges will soon be lost in the welter of matters and their impact felt not at all.

. Not only in judicial effectiveness, but financial, as well. The court fills the city’s coffers to the tune óf over $20,000,000 in revenue a year (fines, etc.). It works on a budget of only $9,000,000. Quite a profit! And yet, while the workload and cost of living have increased, and unlike other courts having less to do, the Judges’ salaries have remained static since the present court was established. There has been no appreciable expansion in personnel or improvment in plant, either. But even if all the money were poured back into the court, it is doubtful that a big dent could be made in the many administrative problems.

. These latter are immediately adjacent the calendar assignment courtrooms. If the Judge in the latter has to attend to his personal needs, he must walk through this anteroom — the so-called “ courtroom ” (where there is not even a raised dais for the office desk the Judge uses as bench) —into the toilet during the trial of a case or hearing being held there.

. Until the recent change in Administrative Judges, only one law assistant serviced the full complement of the Judges. Now there are 4! This opinion, for instance, is entirely mine, researched and written with no help whatever. It was done after court hours, at night and on weekends, on my own private time.

-A. Cf. the jury and nonjury calendars in civil courts. The former is years behind; the latter right up to date. And this, with ever-increasing numbers of Judges.

. The right to counsel at all stages, causing the expansion of legal aid activities with consequent delays in trials.

. Where the Court of Appeals upheld my dissent making en banc discussion among the bench of a 3-Judge court imperative, with consequent interference with Judges’ assignments.

. Cf. “We would not assert, however, that every criminal trial — or any particular trial — held before a judge alone is unfair or that a defendant may never be as fairly treated, by a judge as he would be by a jury ” (Duncan, p. 158).

. I am also motivated by Canon 14 of Judicial Ethics: “A judge should not be swayed by partisan demands, public clamor or considerations of personal popularity or notoriety, nor by apprehensive of unjust criticism ”,

. Cobb, Inferior Criminal Courts Act of the City of New York, Introduction, p. vii.

. After the date set for their receipt, briefs were submitted. This opinion was already drafted but not finally typed. The briefs do not add to the above discussion. Defendant cites a 1936 Tennessee Supreme Court case (State ex rel. Ward v. Murrell; Burns v. State ex. rel. Bowman, 169 Tenn. 688) which contains appropriate and convincing language (pp. 694-696), but the question there raised was answered by Kaminsky (supra) which binds in this State.