Milton Shalleck, J.
Is “ Sexual Freedom in Denmark ” — a motion picture — pure[1] pornography, as claimed hy the District Attorney, or is it pornographically pure[2], as defendants claim? That is the question. And in so many cases there has been such disparity of holding in this field of law that it may in earnest be said, as Hamlet once did[3], it is “ the undiscovered country from whose bourne no traveller returns It is a wandering in the flat of mesalike geography that affords no single line of progress. We make our way ad hoc with bifurcated trails at every turn.
Precedent no longer guides us along the way. For good reason, too: this term “ pornography ” defies definition.[4] And even those Judges who agree that a particular film is not legally pornographic, cannot agree among themselves why.[5] A case-by-case interpretation hardly results in consistency or stability in principle. Yet that is exactly what the court must do (Jacobellis, pp. 188-191; see, also, Lockhart & McClure, Censorship of Obscenity: Developing Constitutional Standards, 45 Minn. L. Rev. 5, 116, 119). The result is hodge-podge. We of the lower courts are constrained to anticipate final action of the majority in a higher court — a most unsatisfactory result. Because of basic differences in approach by its several members, we flounder in wondering what the Supreme Court will do in each matter. We cross our fingers and hope that our guess is correct.
*69 Analogous are the absolutely irreconcilable opinions of the Justices concerning Sabbath laws.[6] My words of dissent in People v. Finkelstein (38 Misc 2d 791, 806) are apposite: “ As can be seen, courts really struggle with this problem. Their differences like those of our highest court, are of ideology. To them the same statutes are written in conflicting language — not by actual verbiage, but by the language of early teaching, environment and religious scruples. I respect the religious beliefs cherished by any man; and I hold with our basic principles of life that each man shall have his untrammelled right to express them by words or action. But must they find their way into the law books as a means of compelling those of contrary beliefs to adhere to the rigidity of action stemming from the past ages which were left behind aeons ago with our increased speed of life, with our changing ways dictated by changing means of living? ”[7]
And this means, simply, that concepts must change as do the times. The awesome scene of men perambulating about a pockmarked moon’s surface is bound to bring about a reassessment of many things in life, whether they be geological or legal. The “ Rover ” of Irwin and Scott can in no way be equated with the horse and buggy we so avidly read about when we were children. Nor can the law remain in the precedent of those horse-and-buggy days. Admitting little change, lacking movement, development or vitality which would characterize a reversion to that comparatively static stage in life, should be legal anathema to those whose work it is to help living with law. The young today are bringing us to the realtiy of a new acceptance of experimental changes all about us. It does not exclude the law. The courts should try to pay attention to the future being made today by those who will have to live in it tomorrow, disagreement or not. Attuning the law to the times is one of the principal functions of justice and the courts. May we never forget it. ‘[1] For rigidity in the application of legal principles as an end in itself, is intolerable in a changing world. The closed eyes of the figure of Justice should not be mistaken for blindness— the inability to see what is happening around her. Instead, the blindfold should symbolically evince an inner sight —to change the balance of her scales as community problems demand different weight be given to newly arising questions. To be effective, the interpretation and application of the law *70 must be elastic and viable. New approaches to rights and duties should always govern judicial decision.”[8]
That is not to say that historical precedent should no longer he a guide. On the contrary, the lessons learned from a long line of usage can, in most instances, lead us in the right perspective to accept the new. Laws, whether enacted by Legislatures or molded by the thinking of our highest courts, reflect the desires, likes and wants of the community as a whole. It is that general bent of mind which impels the laws by which we are to be governed. If our wishes change, so will the laws, however slow. It is the little intrusions upon general acceptances which may in time cause change; not the shocking innovations. These cause revulsion rather than revolution. The few cannot overnight overturn what has grown up for a long time to be the acceptable way of community life and so indited in its laws governing the behavior of, and the relations among, people.
The difficulty to the immediate acceptance of the new is the general innocence of the public to a “sophistication” which is ofttimes self-proclaimed. If the community considers it a misguided uprising — -an activity which mocks people and their way of life — acceptance is delayed because of the unknown future it portends.
With this background we must evaluate the question herein first propounded. Since ‘ ‘ expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments” (Joseph Burstyn, Inc. v. Wilson, 343 U. S. 495, 502), we are at liberty to do so. But 1 ‘ the line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn * * *. The separation of the legitimate from illegitimate speech calls for * * * sensitive tools” (Speiser v. Randall, 357 U. S. 513, 525). A work cannot be judged on the basis of individuals with peculiar notions or idiosyncrasies whom nothing would offend, nor by those with exceptional sensitivity who would be shocked even by the natural. Members of the judiciary are included in these categories of humans. The test is ‘ ‘ the judgment of the aggregate sense of the community” (United States v. Harmon, 45 F. 414, 417). “ The use of censorship must be * * * circumscribed by the wants and needs of the people, not by the singleness of a court’s mind. The Judge must project himself *71 into the collective thinking of the community and * * * must decide not what he thinks is good for the community, but what he believes the community wants for its own consumption ”.[9]
There has been no previous definitive ruling that the motion picture “ Sexual Freedom in Denmark ” is or is not obscene, although the defendants have made numerous efforts in various legal manoeuvres to have the courts rule that its public showing could not be interfered with. For example, a temporary injunction, in a declaratory judgment suit, was denied at Special Term of the Supreme Court, New York County (Art Films, International v. Hogan, N. Y. L. J., March 3, 1971, p. 2, col. 1). Later, in that same declaratory judgment suit, the motion for summary judgment to declare the film nonpornographic was denied because of the triable issues unresolvable on that motion (N. Y. L. J., July 8, 1971, p. 2, col. 1, Asch, J.).
The latter court relied on the “ substantial authority to the effect that illegal obscenity raises questions of fact as well as that of law (People v. Fritch, 13 N Y 2d 119, 124; People v. Kirkpatrick, 64 Misc 2d 1055, 1072; People v. Weingarten, 50 Misc 2d 635, 636; Jacobellis v. Ohio, 378 U. S. 578, 581; Manual Enterprises v. Day, 370 U. S. 478, 488; Kingsley Int. Pictures Corp. v. Regents of University of State of New York, 36 U. S. 684, 708; Roth v. United States, 354 U. S. 476, 497-498; Lockhart & McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn. L. Rev. 5, 114 — 116 [1960]).”
There is respectable authority also that whether a particular work is obscene, is solely a question of law (People v. Stabile, 58 Misc 2d 905, 906; United States v. I Am Curious-Yellow, 404 F. 2d 196; United States v. Klaw, 350 F. 2d 155; Womack v. United States, 294 F. 2d 204, 206, cert. den. 365 U. S. 859). The questions of fact which dictated the denial of summary judgment in the suit for a declaratory judgment are not here extant. For while there may have been questions of fact involved in such previous motion in that suit, on this motion before me to dismiss 1‘ the information * * * [on the ground] that the motion picture film * * * is, as a matter of law, not obscene and is expression protected by the First Amendment ”, both the People and the defendants have eliminated that element of possible factual involvement.
The People seek to hold the defendants criminally accountable under section 235.05 of the Penal Law for having ‘ ‘ exhibited to the public a movie entitled ‘ Sexual Freedom in Denmark ’ *72 [which is] obscene in that it depicts acts of sexual intercourse and oral sodomy.” But they concede that there is no factual issue. The Assistant District Attorney in charge of this matter stated to the court on this motion: “ The People will not submit an answering affidavit or memorandum in this case. I would submit that on the basis of the film alone, the Court would be well aware of the law. It would be a futile gesture on the part of the People to submit a memorandum in this case. If you see the film you realize that it is pornographic. As a matter of law it would be obscene.” Thus both sides wish me to make a determination from the viewing of the film alone and deciding as a matter of law that it is or is not obscene. The subtleties and nuances of factual conflict are not now available to me as they were to Justice Asch. I do not have even the benefit of escape from absolute and definitive resolution here by such issues as minors’ viewing of the subject film or soliciting them or pandering — facts which involved publications like 11 Bros ”, some time back,[10] and resulted in criminal guilt of the accused publisher.
I have seen the film. It deals with sex in its basic forms. It transcends that, however. There are pseudo-seminars with psychologists, writers and teachers. There are explanations of the biological implications of the sex act. It shows the actual birth of a child. It attempts to be a physiological treatise on all aspects of sex. There are interviews with other professional and lay people, with girls who hire themselves out as actresses in admitted pornographic films. There are presented flashes of starving children and bleeding soldiers, and an effort made to juxtapose these shots with the discourses on sexual freedom, concluding with a query of which is the obscene. There are close-ups of male and female genitalia. There are graphic explanations of each, as well as their functions. It is pictorially as explicit as any 1 ‘ skinflick ’ ’ that can be imagined. Heterosexual intercourse and various coital positions and practices are not omitted. It essays to prove that research in sex has led the professional therapeutists to help others live happy lives through adequate sexual knowledge and diversified sexual experiences, not necessarily without the marriage relationship.
In short, the picture is geared to selling the point of view that there should be no restrictions on sex between consenting individuals. The photography is of the highest calibre. But textually it is as jerky as the preceding paragraph of this opinion— written so, purposely to illustrate this statement. As one *73 critic of the “ Hollywood Reporter5,[11] put it, it “ is a documentary posing as an exploitation * * * which presumes to examine sexual attitudes and education in Denmark * * * [it] is one of the few films on the circuit which is genuinely erotic without the necessity of making its audience feel dirty ” (emphasis supplied). Does it then come within the proscribed concurrence of the three tabus of Roth v. United States (354 U. S. 476)[12].
A monetary gain motive- — a most evident reason for public offering at a “fat” price of admission — in showing films of this nature, is not an apparent determining factor for denying the right to show them. Excepted, of course, are those excessively greedy motivations, for instance, which cause the entrepreneur to pander, invade privacy, or display his offering to minors. The latter is absent here. So that the film must be judged alone vis-a-vis the permissible ambit of legality, placed in its present posture.
With public knowledge, the motion picture “ Sexual Freedom in Denmark ” was shown uninterruptedly in New York County at a theatre in midtown Manhattan for 32 weeks until the arrest of the defendants. While the court acknowledges that it has neither standing nor wish to challenge the District Attorney’s discretion in taking steps only after such long “run” of the film — especially when considering the high regard I hold the one prosecuting this case — one can still wonder why. The absence of immediate action or none at all, is immaterial if the showing is protected by the First Amendment. There are other films of this ilk against which I know of no positive action; and these make no attempt to explain or teach sex scientifically as does the instant film.[13] Perhaps acceptances have changed. As for ratings, a recent magazine article contained this statement: ‘1 What was once R is now GP, and what was X only a year ago is now R. As such ratings and audience thresholds change, so does the borderline of legal obscenity, which is partially defined by ‘ contemporary community standards ’ that are constantly *74 getting lower.”[14] If the trend continues we may simply become a nation of voyeurs. On the other hand, repetition may bore us, resulting in a renascence of “ old ” approaches' to a most gratifying and personal part of life.
Were it my own uninhibited reaction to the film — not as one sworn to follow the law as given to me by our highest court, but wholely subjective, due to my own predilections — I would conclude other than I am here constrained to. It is a showing to which I would not care to take my wife — not that she is super-sensitive or is ignorant of what the film portrays but because, as Judge Moore said in United States v. 35 mm. Motion Picture Film [Language of Love] (432 F. 2d 705, 711): “ Several sequences in the film we found offensive, not because they excited predilection to prurience but because they intruded upon areas of interpersonal relations which we consider to be peculiarly private. Our sensibilities were offended, but that is a matter of taste ”. It is a personal choice on the part of any prospective customer to the theatre showing such a film — to pay the price of admission and go in or save the money and stay out.
Cases have gone far and Judges are prodded to an ever-increasing extreme to hold that the First Amendment supersedes all other considerations. In cases like Pinkus v. Pitchess (429 F. 2d 416) the defendant was convicted of possessing an obscene motion picture, showing, as the court stated, 1 ‘ a woman, who, disrobed, feigns some type of sexual satisfaction which is self-induced * * *. The district judge as did the state court jury, made the factual determination that the film was obscene ’ ’. Despite how the individual members of the appellate court personally felt about the film, they “ concluded that we cannot reconcile the determination with Supreme Court decisions in several cases involving comparable material” (p. 417).
*75 While the defendants stress the Stanley v. Georgia (394 U. S. 557) case as having eliminated the holding of Roth that obscenity is not protected, the majority opinion does not destroy that former holding. Marshall, J., in acknowledging that “ The line between the transmission of ideas and mere entertainment is much too elusive for this Court to draw, if indeed such a line can be drawn at all” (p. 566), said, for the majority: “ Roth and the cases following that decision are not impaired by today’s holding. As we have said, the States retain broad power to regulate obscenity; that power simply does not extend to mere possession by the individual in the privacy of his own home.” (P. 568.) And by way of emphasis, and to underscore the limited character of the holding in that case, he reiterated that “ the First and Fourteenth Amendments prohibit making mere private possession of obscene material a crime.” (P. 568.) The Per Curiam opinion in Redrup v. New York (386 U. S. 767) goes no further in principle; it protected the ‘ ‘ distribution of the publications ” (p. 770) at issue in that case.
Most closely allied is the “ Language of Love ” case (432 F. 2d 705, supra). That was “ a movie version of the ‘ marriage manual ’ ” — a veritable primer of marital relations — ‘ ‘ the Kama Sutra of electronic media ”, including explicit scenes of heterosexual activity, female masturbation and eunnilingus. A jury below and the trial court held the film obscene and not importable. The scenes of sexual activity, said the reviewing Court of Appeals, were ‘ ‘ shockingly explicit ’ ’ but they were bound “ to consider the manner in which sex is presented, not its frequency, variety or explicitness per se.” As here, “ The government presented very little evidence beyond the film itself for assistance in determining the obscenity vel non of the film.” Holding that the Supreme Court ‘ ‘ has never intended to brand as ‘ obscene ’ representations of sexual matters which do not import a debasing, ‘ shameful or morbid ’ quality into the expression or depiction of human sexuality ”, it found as a fact that 1 ‘ the scenes of graphic, explicit physical activity were [not] simply injected into the film with no relation to the theme ” — a finding I make here. The court in conforming, by interpretation, to the sometimes nebulous law as announced by the highest court, reversed, and released the film to the claimants.[15]
*76 My constraint is no less acute. The film here is similar in nature and content. What I think of it as an individual is immaterial. As a Judge I cannot stultify myself to satisfy my personal feelings and inclinations. I am hound by oath and duty to judge the cases before me on the facts as I find them but circumscribed by the law as dictated to me by the highest court. In that setting I have no alternative. The facts are here indisputable; the law applied to those facts binds me to the single end of granting defendant’s motion and dismissing the complaint. It is protected by the First and Fourteenth Amendments — encased in the armor of the present state of the law which is of sufficient strength and thickness to prevent a piercing by a court of such small calibre arms as this.
The motion is granted. Complaint dismissed. Defendants discharged.

. This word is used in its antithetic sense.

. Here it is used in its pristine sense.

. Act III, Scene 1 (by William Shakespeare).

. Justice Potter Stewart in Jacobellis v. Ohio (378 U. S. 184, 197).

. i.e., in Jacobellis: Brennan and Goldberg, JJ., stated that under Both, “ The Lovers ” was not obscene in a community that was national in standard and scope; Justices Black and Douglas believed that the First Amendment safeguards freedom of the press which also binds the States under the Fourteenth Amendment and referred to Douglas, J.’s dissent in Both, making no reference to what “ community standards ” means; nor did Justice Stewart, when he concurred. He believed that the First and Fourteenth Amendments apply only with respect to “ hard-core ” pornography and this picture was not that. Justice White expressed no opinion in concurring. The dissenting Justices Warren, ■Clark and Harlan had differing ideas, too, although the two former agreed that there was no adequate definition of pornography, that there could be different interpretations of Both and that there was no such thing as national community standards.

. Refer to the analysis in my dissenting opinion in People v. Finkelstein (38 Misc 2d 791).

. See, also, Cardozo, J.: Growth of the Law, pp. 83-87.

. People v. Moses (57 Misc 2d 960, 964).

. People v. Hay (41 Misc 2d 606, 614).

. Ginzburg v. United States (383 U. S. 463).

. Issue of April 1,1970 annexed to the moving papers as part of Exhibit A.

. Arousal of prurient interest; according to contemporary community standards, without redeeming social value; hard-core pornography of patent offensiveness.

. “ Perfect Friday ”; “ Boys in the Band”; “ The Grasshopper”; “ Watermelon Man ”; “ The Telephone Book ”; “ Fellini Satyricon ”; “ Tropic of Cancer”; “ Women in Love”; " The Adventurers”; “ Cherry, Harry and Raquel ”, to mention a few.

. Time, April 5,1971: “ Pornography Revisited: Where to Draw the Line ”; a Time Essay by Ruth Brine.
The lowering of ratings is not altogether the result of audience desires. I believe it is foisted upon the public by the producer to make it “ spicy ” and to entice without the prohibited pandering. I have a film particularly in mind. It is “ Ryan’s Daughter ”. It is a beautifully photographed motion picture — one of the finest I, personally, have ever seen on the screen. The film’s theme itself is threadbare, and by this time, trite. It was first used by Hawthorne in 1850 — over a century and a score of years ago — in “ The Scarlet Letter.” More recently, the film “ Zorba ” had it. The only real differences were settings: Massachusetts, Greece and Ireland. In “Ryan’s Daughter” only the mentally deficient viewer could not know that this Irish married lady was committing adultery with the English officer. So when the scene shows him opening her blouse, exposing, then fondling and kissing her right breast, the only purpose of it was to change the film’s rating. For it added nothing to the theme, story line, or photography.

. On the “national” or “local” community controversy, it is interesting what this court said: “ local communities are not without protection against the swelling tide of 1 entertainment1 which exceeds their own limits of decency in the portrayal of both sex and violence” (p. 715) (italics supplied).